## MORROW v. DE VITT et al.

### HAWKINS v. SAME.

### Nos. 5432, 5433.

Court of Civil Appeals of Texas. Amarillo.
March 2, 1942.

Rehearing Denied April 6, 1942.

Bean, Evans & Bean, of Lubbock, and Bromberg, Leftwich, Gowan & Schmucker, of Dallas, for appellant T. F. Morrow, intervenor.

Bradley & Wilson, of Lubbock, Wynne & Wynne, of Longview, Clower & Wilson, of Tyler, and Underwood Johnson, Dooley & Wilson, of Amarillo, for appellant J. C. Hawkins, intervenor.

Vickers & Campbell, of Lubbock, for appellees Christine De Vitt and Florence A. De Vitt.

Crenshaw, Dupree & Milam, of Lubbock, for appellee W. D. Johnson.

Jack M. Randal and F. D. Brown, both of Lubbock, for Sam C. Arnett, receiver.

E. L. Klett, of Lubbock, for appellees J. Lee Johnson, Jr., Mary Louise Johnson, Katherine Frances Johnson, Floy Johnson North, Mrs. Clay Parker and Mrs. Pattie Byars.

Levy & Evans, of Fort Worth, for appellee Helen D. Secrest.

JACKSON, Chief Justice.

The two above styled and numbered cases were tried together by the court below who refused to grant a motion to try them separately and by his order one statement of facts only was made and filed in this court to be considered as a part of each of the records.

There are two appeals, one from the refusal of the trial court to confirm an oil, gas and mineral lease made by Sam C. Arnett, the receiver of the Mallet Land and Cattle Company, a Missouri corporation, with T. F. Morrow, lessee, on certain oil, gas and mineral lands, and a lease on certain oil, gas and mineral rights on other lands made by the receiver and J. C. Hawkins.

On August 27, 1941 the Seventy-second District Court of Lubbock County appointed Sam C. Arnett receiver of all the property of the Mallet Land and Cattle Company situated in Texas on the ex parte application of J. Lee Johnson, Jr., one of the directors of said company, for himself and as trustee for Mary Louise and Katherine Frances Johnson, each of whom is a feme sole, and as attorney in fact for Mrs. Floy Johnson North, Mrs. Clay Parker and Mrs. Pattie Byars. The Mallet Land and Cattle Company, hereinafter called the company, has a permit to do business in Texas and the oil and gas leases to Morrow and to Hawkins covered lands owned by the company.

The court set for hearing this ex parte order on September 5, 1941 and had all the stockholders notified thereof and on said date all the stockholders not named as plaintiffs in the application for receiver answered and each agreed that the appointment of the receiver theretofore ordered should be made permanent, which included all the stockholders of the company, the court confirmed such ex parte order and continued the receivership and Sam C. Arnett as receiver. From this order an appeal was later prosecuted by Miss Christine DeVitt attacking the jurisdiction of the trial court to appoint a receiver and this court after consideration of the appeal affirmed the court below in an opinion this day announced, De Vitt v. Johnson, to be published in 160 S.W.2d 974 to which we refer to avoid the repetition here of the pertinent facts therein contained.

Much of the land owned by the company in Texas was leased and producing oil and the directors of the company, to facilitate the handling of the unleased land, had appointed from their number what they designated as an oil committee. Through this committee the company kept in touch with the field and its development and also with the independent operators and major companies. With many of these, negotiations

were had by the company to lease land it still retained but on account of internal dissension and the suit in the State of Missouri instituted by one of the stockholders and directors, Miss Christine DeVitt, the oil committee and the directors of the company ceased to function and negotiations and efforts to lease the remaining land of the company terminated. Numerous producing wells had been drilled by the owners of the land adjacent to the unleased land of the company and such wells were draining the oil from under such unleased lands. The court found in the judgment continuing the ex parte appointment of the receiver that the stockholders and directors of the company had been in a deadlock for many months and unable to function and discharge their duties to the corporation; that much of the land involved in the receivership contained oil and gas in commercial quantities and such lands were not being developed nor the oil nor gas produced therefrom; that the acreage of the company was thereby being drained of the oil and gas which was resulting in irreparable injury, waste and loss; that the company had opportunities to lease the land and secure drilling contracts on favorable terms; that an emergency existed making it imperative that a receiver be appointed to take charge of the property and make leases, enter into drilling contracts and exercise and perform all the duties in connection therewith and followed such findings by this order: "That Sam C. Arnett, a bona fide citizen of Lubbock County, Texas, and a qualified voter of this State, and not a party or attorney or in any way interested in the action for the appointment of this receiver, and not in any way disqualified, be, and he is, hereby appointed receiver for all of the property, real, personal or mixed, that the defendant Mallet Land and Cattle Company has in the State of Texas, and he is hereby authorized and directed as such receiver * * * to execute such acquittances or releases as may be pertinent or necessary in the premises; to sign division orders for the collection of any oil runs that may be due said corporation; to negotiate, make and enter into oil, gas leases and mining contracts on the lands of said corporation lying in the State of Texas; to buy and sell cattle; to render property for taxation purposes and pay said taxes; and to do any and all other things necessary for the proper conduct of the business of said corporation within the State of Texas, whether such business relates to cattle or oil; to employ such agents, attorneys, assistants or servants as in his judgment may be necessary properly to conduct such business; and to make and enter into such contracts and agreements under the supervision of this Court as may be necessary both to preserve the assets of the corporation and prevent the same from loss by virtue of drainage; and to do and perform all and any other acts necessary for the proper and orderly conduct of, and the conservation of, the business and assets of said corporation lying within the State of Texas."

Sam C. Arnett qualified as receiver on September 6, 1941 and immediately entered upon his duties as such. On September 8, 1941 he received in the form of a written lease the proposition of T. F. Morrow to lease Labors Nos. 1, 2, 3, 8, 9, 10, 11, 12, 13, 18, 19, 20, 21, 22 and 23 in League 48, Hockley County, Texas. The consideration the lessee Morrow agrees to pay the lessor is 3/8 of the oil and gas, including casing-head gas, produced, saved and marketed from each well with an obligation to begin drilling with at least two adequate strings of drilling tools within 30 days after the confirmation by the court of the lease and to continue such operations with diligence and dispatch until the acreage should be fully developed. This was the first proposition from a prospective lessee presented to the receiver for any of the lands.

The receiver discussed with, and consulted W. D. Johnson, who was president of the company, J. Lee Johnson, who was a director of the company, and Mr. Secrest, the divorced husband of Mrs. Helen DeVitt Secrest, who had gotten permission from the receiver for her former husband to be present at the negotiations, all of whom advised that in their judgment the proposition of Morrow was a good one and should be accepted. They also informed Mr. Arnett that Mr. Morrow had been negotiating with the company for some months for the acquisition of the labors described in his lease previous to the appointment of the receiver; that a lease contract had been agreed upon by the stockholders and Mr. Morrow which was not so favorable to the company as the contract presented to the receiver but on account of internal dissension no lease was executed to the property by the company to Mr. Morrow. During the trial the court stated that in his opinion the testimony disclosed that all the stockholders except Christine

DeVitt had approved the lease to T. F. Morrow. The receiver signed the lease on September 8, 1941 somewhere around 4 o'clock P. M. and it was soon thereafter filed for record in the county clerk's office.

Mr. J. C. Hawkins for several months prior to the appointment of the receiver had been negotiating with the directors of the company for a lease on some part of the unleased land but no lease had been consummated. An agent of his was at Lubbock September 8th and 9th and discussed with the receiver a lease for his principal on several labors of the land for a consideration of ⅜ of the oil and gas produced from the lease. Mr. Hawkins arrived in Lubbock where the receiver was conducting the negotiations about 4 o'clock P. M. Tuesday, September 9th. He heard that the receiver had leased to T. F. Morrow fifteen labors, retaining for the company ⅜ of the oil and gas produced thereon; that the balance of the land was for lease and that others were offering more than the consideration paid by Mr. Morrow. He decided that if he could secure all of the unleased portion of the land he could pay a greater consideration. He saw the receiver in the hotel room of J. Lee Johnson, one of the directors, that night and in a conversation which lasted about five minutes made an oral proposition for a lease. He then got in touch with his lawyer and instructed him to draw a lease containing the oral proposition he had made to the receiver for the land in the room of J. Lee Johnson. The lawyer worked on this instrument until after midnight and at 8 o'clock the next morning, the 10th, Hawkins presented to the receiver at the bank the lease with the request that if it were acceptable to execute it as receiver for the company. The lease so presented covered all of League No. 47 except Labors Nos. 20 and 21, and all of Labors Nos. 4, 6, 7, 14, 17 and 24 in League No. 48, and all of League No. 46 save and except Labor No. 5, situated in Hockley and Cochran Counties, Texas.

In addition to the consideration of ⅜ of the oil and gas produced Mr. Hawkins agreed to pay $25,000 in cash and also $1,000 per well for each producing well after 25 wells had been completed; also to begin drilling with three rigs within 30 days from the confirmation of his lease by the court and to continue drilling with diligence and dispatch until the development of the land. He further agreed that within 160 days after his lease was approved to begin and drill a test well 6,500 feet deep on unproved lands either in League 47 or 48 and within the same time to begin and drill a well 6,500 feet deep on League 46, and pay ⅜ of the gasoline manufactured from gas during the life of the lease and an additional ⅟₁₆ of the oil and gas produced and marketed from Leagues 47 and 48 if and when the market price of oil was as high as $1.50 per barrel.

About 9:30 o'clock A. M. September 8th, Cotton and Bass as agents of Champlin Refining Company and Champlin & Bass, Inc., saw the receiver at the bank and informed him they desired to bid on the land for their principals. He requested that they put their offer in writing and return it later. About noon or soon thereafter the receiver, with the approval of all the stockholders except Christine DeVitt, promised T. F. Morrow to lease him the 15 labors on the terms described in his proposition in the form of the lease contract. Since Mr. Morrow was the first to make a bid to the receiver his was the best offer to that time. Somewhere about 2:30 P. M. the same day and prior to the execution and delivery of the Morrow lease Cotton and Bass returned to the bank with a written instrument containing the offer of their principals. Sam C. Arnett, the receiver, informed them he had decided to lease T. F. Morrow 15 labors. They demurred to this but, after some discussion, on a request to come again and see the receiver later, they left with him the written proposition which constituted their offer which reads as follows:

"Champlin Refining Company, Enid, Oklahoma Lubbock, Texas
"September 8, 1941 D. W. Cotton Secretary and Treasurer
"Mallett Land and Cattle Company
"Lubbock, Texas
"Gentlemen:
"Subject to approval of title and execution by proper authorities of our respective companies of an agreement yet to be drawn and to be mutually agreed upon relative to drilling program, tax matters, and other details pertinent thereto, we desire to acquire and you agree to deliver to us a valid oil and gas lease upon terms to be mutually agreed upon covering: Leagues 47 and 48, or League 48, or the East 15 Labors of League 48; * * *."

The consideration contained in the offer was ⅜ of the oil and gas produced, saved and marketed from the property and an additional 1/16 of all oil and gas produced if and while the price equaled or exceeded $1.50 per barrel and if and when the price is below $1.50 per barrel the proposition of 1/16 is of no force or effect but reverts to the Champlin Refining Company. Some time later Cotton and Bass told the receiver orally that in addition to the consideration in their written proposition they would pay $50,000 cash for the first 50 wells located and an additional $1,000 for each well located exceeding 50 in number. The receiver told them he was inclined to let them have ten labors and they advised him while they wanted all of it they would accept ten labors on the same basis per labor. They saw the receiver next morning at the bank and he, J. Lee Johnson and W. D. Johnson were in a conference and after a few minutes W. D. Johnson came and advised them that someone had told J. C. Hawkins what their offer was and he had met it and in addition agreed to drill a test well on League 46. Mr. Johnson returned to the table where J. Lee Johnson and the receiver were and Cotton shortly after went to the table and said, "We have made a better offer than the Hawkins lease" and Arnett told him, "We are ready to make the lease to Hawkins" and Mr. Cotton then advised him that they would do better than any of the offers they had theretofore made and when the receiver insisted on signing the lease to Hawkins, Cotton and Bass asked if he were going to force them to see Christine DeVitt's lawyer and go to court. The receiver in rather emphatic language told them they could do what they pleased. He signed the lease and made his report of the leases to the court with a request for his approval. Champlin Refining Company and Champlin & Bass, Inc., through agents, at once sought and obtained the permission of W. D. Johnson to use his name to contest the confirmation of the leases the receiver had made and upon their agreement to pay all attorneys' fees, expenses and costs, he consented and the various contests opposing the confirmation of the leases of the receiver were immediately filed. Their objections to the approval of the leases are based on the allegations that neither Morrow nor Hawkins is shown to be financially able to perform the obligation imposed upon him by the terms of his lease; that the receiver failed to advertise the time and place of the sale and acted too hastily; that he should have advertised and sold on secret bids or at public auction; that he could have obtained for the lessees a higher cash bonus and that Champlin Refining Company and Champlin & Bass, Inc., had made an offer which he refused although it was more advantageous to the company than the Hawkins lease which he accepted; that the method used by the receiver in making the sales was such as to discourage rather than encourage bidders and resulted in chilling bidding by those who desired to purchase any of the acreage.

The receiver answered the contest by general demurrer and general denial.

With permission of the court T. F. Morrow and J. C. Hawkins each filed pleas of intervention; alleged the receivership; that they were interested in the subject mattter of the controversy; that his lease was fair and equitable and made without fraud or collusion and that they were purchasers in good faith and were ready, able and willing to perform the obligations imposed by the contracts and asked that the leases be approved.

On a hearing before the court on October 28th he refused to confirm the leases made by the receiver to Morrow and to Hawkins, from which action of the court each of the lessees prosecuted his appeal. McBride et al. v. United Irr. Co., Tex.Civ. App., 213 S.W. 988.

In our opinion the testimony shows without controversy that T. F. Morrow and J. C. Hawkins were each financially able, ready and willing to perform all the obligations imposed upon him by his lease contract.

On the issue of advertising and haste the testimony is that on September 6th, after he qualified, the receiver by wire advised the Stanolind Oil Company, W. D. Fleming, E. H. Pipkin, the Wilshire Oil Company and numerous other oil men and companies that he was prepared as receiver to make leases Monday and Tuesday, the 8th and 9th of September, on the unleased oil lands belonging to the Mallet Land & Cattle Company. On the same day by long distance telephone he talked to the Gulf Oil Company, the Magnolia Company, the Honolulu people and furnished them the same information. Most of them answered and advised that on account of the demand for ⅜ of the oil and gas produced they were not interest-

ed in bidding on the land. Mr. W. D. Johnson, the president of the company, dictated telegrams to E. H. Pipkin and the Wilshire Oil Company and included in these telegrams in addition to the wires to the Stanolind Company and W. D. Fleming these statements: "Am not sure we will be able to give you anything. Probably better wait for notice later." These the receiver signed at the request of Johnson. The Wilshire Oil Company answered the receiver promptly by wire, advising him that it had an agreement with W. D. Johnson to lease land from the company on a straight ⅜ royalty basis and felt it was entitled to the same consideration as anyone else. On the 10th it wired that it had been unavoidably detained in Los Angeles and hoped for favorable consideration on their offer. This referred manifestly to the offer of ⅜ mentioned in the first telegram. Mr. E. H. Pipkin received his telegram, talked to the receiver by phone from Los Angeles, California, and was advised to come to Lubbock. He did come on the same train and arrived at Lubbock at the same time as J. C. Hawkins, however, he says when he reached Lubbock he learned that the receiver had leased the 17 labors in which he was interested to T. F. Morrow and at no time filed a bid with the receiver for any part of the land. He testified that he filed a bid with one Mr. Rush, whose identity is not explained, and then withdrew it. Why the president wanted these additional statements in these two telegrams he failed to explain but there is no claim in the record that any damage resulted therefrom or that he was acting wrongfully or with any ulterior motive by reason thereof nor do we think the receiver should be censured because he signed such telegrams at the request of the president of the company.

E. L. Klett a few days previous to the trial sent the following telegram:

"Lubbock, Texas, October 25, 1941

"The Texas Company Fort Worth, Texas

"I represent plaintiff in Johnson versus DeVitt Receivership Mallet Land & Cattle Company pending Lubbock. Receiver has executed mineral leases, subject to approval court, providing for payment three-eighths royalty and continuous drilling not less than two rigs on Lease No. one and three rigs on Lease No. two herein mentioned. Lease No. one covers Labors 1, 2, 3, 8, 9, 10, 11, 12, 13, 18, 19, 20, 21, 22 and 23, League 48, Hockley County. Lease No. two covers all League 47 except Labors 20 and 21 and all Labors 4, 6, 7, 14, 17 and 24 League 48, Hockley and Cochran Counties. Lessee in last named lease to pay one thousand dollars for each completed producing well. If you are interested in making as good or better lease if given opportunity please wire me collect immediately and state what better offer you would consider making."

On the same day he sent a wire couched in the same language to the Magnolia Petroleum Company at Dallas, Texas, to the Gulf Production Company at Houston, Texas to the Humble Oil & Refining Company, Houston, Texas, to the Shell Petroleum Company, Houston, Texas, Skelley Oil Company, Tulsa, Oklahoma, Honolulu Oil Company, Midland, Texas, Devonian Oil Company, Tulsa, Oklahoma, Stanolind Oil & Gas Company, Midland, Texas, Tidewater Oil Company, Midland, Texas, Atlantic Refining Company, Dallas, Texas, Cascade Oil Company, Fort Worth, Texas, Western States Gasoline Corporation, Lubbock National Building, Lubbock, Texas. He received replies to each of these wires the substance of which was to inform him that the company addressed was not interested in leasing the Mallet Land and Cattle Company oil lands on a basis of ⅜ royalty. About the same time F. D. Brown and Jack M. Randal, attorneys for the receiver, visited Midland, Texas, and conferred with the oil companies who maintain branch offices there but found no one who desired to make an offer for the land or any part thereof.

It will be noted that the judge created the receivership and appointed Sam C. Arnett receiver on the agreement of the stockholders; that he found the lands of the company were being drained resulting in irreparable loss, injury and waste; that there was opportunity to lease the lands and secure favorable drilling contracts; that an emergency existed and it was imperative that a receiver be appointed to make leases and upon these facts he appointed the receiver and gave him authority to negotiate, make and enter into oil, gas leases and mining contracts on the lands. None of the stockholders contesting the confirmation of these leases objected to the authority vested in the receiver by the judgment of the court. He was not required to advertise the land for lease nor to receive secret bids nor to

sell by public auction but was clothed with the authority to make leases at private sale in his own discretion subject only to the approval of the court.

Whether or not a greater cash bonus could have been obtained from a desirable lessee is uncertain and whether or not a higher bonus would have been a better proposition for the company was purely a matter of business judgment. On October 21st, seven days before the trial began, W. D. Johnson in a letter to the receiver said that he did not believe it would be to the benefit of the stockholders to get as much as $100,000 cash bonus in a lump sum on account of the greater amount of income tax that the company would be required to pay and in his opinion it would be more economical to receive the money in smaller amounts.

Relative to chilling bids, the testimony reveals that someone informed each of the bidders what amount had been offered by his competitor and this admittedly resulted in Hawkins raising his bid and in Champlin Refining Company and Champlin & Bass, Inc., in their alleged written offer raising their bids from time to time. Instead of chilling the bids it undoubtedly resulted in stimulating the prospective purchasers to pay higher considerations.

 We doubt if the alleged proposition in the name of the Champlin Refining Company had sufficient certainty to be characterized as an offer. It is essential that an offer be certain and unambiguous since the acceptance is required to be identical with the offer and without certainty in the offer there is no meeting of the minds and no agreement. "Therefore, if the offer is in any case so indefinite as to make it impossible for a court to decide just what it means, and to fix exactly the legal liability of the parties, its acceptance cannot result in an enforceable agreement." 13 C.J. 266, § 59; 17 C.J.S., Contracts, § 36. The written instrument and the testimony shows that Cotton and Bass continuously proposed to pay a higher consideration than their previous offer and what they claim is their offer never rose above the dignity of an invitation to negotiate.

In 12 Am.Jur. 526, par. 28, the author says: "If a proposal is one merely to open negotiations which may or may not ultimately result in a contract, it is not binding though accepted. An invitation to enter into negotiations is not an offer which, together with the acceptance thereof, forms a contract. Such a proposal may be merely a suggestion to induce offers by others."

It was formerly the rule in England that until the confirmation of a master's report the bidding would be opened upon a mere offer to advance the price ten per centum but with this rule Lord Eldon expressed much dissatisfaction and his views were finally adopted in the sale of land under execution or by receivers, " * * * so that now the highest bidder at a sale by auction of land, under an order of the court, provided he has bid a sum equal to or higher than the reserved price, (if any) will be declared and allowed the purchaser, unless the court or judge, on the ground of fraud or improper conduct in the management of the sale, upon the application of any person interested in the land, either opens the biddings or orders the property to be resold. 1 Sugden, Vend. & Pur. (14th Ed.) by Perkins, 114, note a.

"In this country Lord Eldon's views were adopted at an early day by the courts, and the rule has become almost universal that a sale will not be set aside for inadequacy of price, unless the inadequacy be so great as to shock the conscience, or unless there be additional circumstances against its fairness; being very much the rule that always prevailed in England as to setting aside sales after the master's report had been confirmed." Graffam v. Burgess, 117 U.S. 180, 6 S.Ct 686, 692, 29 L.Ed. 839.

In W. T. Allen v. Edmond Pierson, 60 Tex. 604, the court says: " * * * under no system would a mere irregularity, when taken in connection with gross inadequacy of consideration, be held sufficient ground for vacating a judicial sale, unless that irregularity in some way conduced to that inadequacy."

In Mergenthaler Linotype Co. v. McClure et al., 16 S.W.2d 280, 282, the Commission of Appeals holds: "It is well settled that inadequacy of price in an execution or receiver's sale is not, in the absence of facts or circumstances showing fraud or irregularity, sufficient ground for setting aside the sale. Allen v. Stephanes, 18 Tex. 658; Baker v. Clepper, 26 Tex. 629, 84 Am.Dec. 591; Taul v. Wright, 45 Tex. 388; Pearson v. Flanagan, 52 Tex. 266; Allen v. Pierson, 60 Tex. 604; Has-

kins v. Wallet, 63 Tex. 213; Dilley v. Jasper Lumber Co., Tex.Civ.App., 114 S.W. 878; Graves v. Griffin, Tex.Com.App., 228 S.W. 913."

To the same effect is the holding in First Nat. Bank of Houston v. South Beaumont Land & Improvement Co. et al., 60 Tex. Civ.App., 128 S.W. 436; Cocke et al. v. Southland Life Ins. Co., Tex.Civ.App., 75 S.W.2d 194.

In Mudge et al v. Hughes et al., Tex.Civ. App., 212 S.W. 819, 824, the court says: "Contracts made by receivers under authority given by the court are in a substantial sense the contracts of the court, and cannot be annulled at the pleasure of the court."

The doctrine is stated in 53 C.J. 214, par. 347, in the following language: "It is the general rule, * * * that mere inadequacy of price, where not such as to be unconscionable or to work serious injustice, will not cause confirmation to be denied, nor will an offer, made subsequent to the sale by another than the purchaser, of a higher price for the property, except where the bid or offer has been accepted by the receiver expressly subject to the condition that no higher bid should be received."

About two months after the lease with Hawkins was signed by the receiver, at the trial of the contest in the name of W. D. Johnson prosecuted by the principals of Cotton and Bass, the Champlin Refining Company and Champlin & Bass, Inc., the court permitted them to introduce an unsigned lease which Cotton testified his principals would execute subject to the approval of title to the land and the receivership proceedings by their attorneys. He also stated that the only difference between the Hawkins lease and the lease his principals were willing to sign is that Hawkins pays $25,000 in cash and $1,000 on each additional well after 25 wells were drilled and his principals are paying $100,-000 cash and $1,000 for each additional well after 100 wells have been located. However, we note that the lease presented by Cotton for his principals provides that if at any time the lessees are rendered unable by inability to obtain the necessary material or adequate labor on account of strikes, lockouts or industrial disturbances, acts of the public enemy, defense priorities, restraints of rulers, delays or interruption in the delivery of material orders, or if any action or appeal was filed in any court of law or equity involving the title to the property the obligations of the lessees should be suspended during the continuance of such inability, cloud on title or court action. Mr. Hawkins accepted the title without reservation and agreed to prosecute development continuously with dispatch and diligence until the contract was performed. He asked no suspension of performance on account of strikes, industrial disturbances, priorities, restraints of rulers or delays in obtaining materials. If the receiver had accepted the invitation to negotiate until Cotton and Bass presented this lease on October 28, 1941, in our opinion, he would have been authorized to accept the unconditional contract of Hawkins and reject the offer presented in court.

It will be observed that none of the contestants claimed that the price accepted by the receiver was less than the usual, customary and market price of the leases in that territory. The fact that some twenty-five companies, independent operators and major companies, declined to bid on the land for the reason they were informed that they would be required to pay ⅝ of the oil and gas produced, is entitled to much consideration in determining the adequacy or inadequacy of the price accepted by the receiver. The testimony reveals that the payment of ⅝ of the oil and gas produced on lands by a lessee is greatly in excess of the usual and customary consideration paid in oil leases. None of the contestants claimed that the leases executed to Morrow and Hawkins were at a price so inadequate as to shock the conscience. The evidence, in our opinion, fails to show that the receiver was guilty of fraud or injustice or such irregularities or unfairness as would have, either considered separately or together, chilled bidding, discouraged bidders or resulted in decreasing the consideration that could have been obtained. At the time the receiver signed the leases he had the approval of the holders of a majority of the stock and had he subsequently received a higher bid, unless the difference was so great as to indicate fraud or injustice if refused, the court would not have been authorized to refuse confirmation of the bids he had because a higher bid was later made by some other lessee.

A receiver is not required to be infallible in his judgment in the transaction of the business entrusted to him. Both law and equity are satisfied when he exercises the same degree of discretion in the discharge of his duties as an ordinarily prudent man of business would exercise in the management of his own affairs. High on Receivers, 209, par. 176.

Under this record we conclude that the receiver in good faith exercised the same degree of care in the lease he made to Morrow and to Hawkins as an ordinarily prudent man would have exercised in the transaction of his own business.

The judgment of the trial court is reversed and remanded and the trial court directed to enter an order approving the lease to T. F. Morrow and also approving the lease to J. C. Hawkins.