NO. 07-02-0424-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL C



APRIL 8, 2004


______________________________



ROBERT BROWN, TRUSTEE FOR FIRST CITY LIQUIDATING TRUST 


AND MARVY FINGER, TRUSTEE FOR THE WILLIS RANCH JOINT VENTURE,




 Appellants


v.



DAVID HAYWOOD, 




 Appellee

_________________________________



FROM THE 75TH DISTRICT COURT OF LIBERTY COUNTY;



NO. 62,610; HON. J.C. ZBRANEK, PRESIDING


__________________________________



Before JOHNSON, C.J., and QUINN and REAVIS, JJ. 

 A senior partner asked of his associate whether he "would believe that they settled
the case for $1,000,000." In response, the associate responded in an excited voice: "we
got $1,000,000?" To that the senior partner said, "no, I just wanted to know if you would
believe that." An analogous play on words underlies this appeal. 

 Robert Brown (Brown), trustee for First City Liquidating Trust (FCLT), and Marvy
Finger (Finger), trustee for the Willis Ranch Joint Venture, appeal from a judgment
rendered in favor of David Haywood (Haywood). Through that judgment, the trial court
ordered FCLT to specifically perform a contract that it allegedly executed with Haywood. 
Under the purported agreement, FCLT promised to convey to Haywood its 4.75% interest
in the Willis Ranch Joint Venture. Via four issues, Brown and Finger contend that the trial
court erred. However, we need only consider the second issue for it is dispositive of this
appeal. Through it, FCLT and Finger argue that the trial court erred in concluding that the
June 7, 2001 letter sent by FCLT constituted an offer to sell the interest in question. We
reverse and render judgment. Background

 Prior to June of 2001, Haywood owned a 50% interest in the Willis Ranch Joint
Venture. The remainder of the interest was owned by other individuals or entities for whom
Finger acted as trustee. However, due to the bankruptcy of an interest owner, First City
Bank acquired the 4.75% interest at issue here. Thereafter, the bank failed and various of
its assets were assigned by the Federal Deposit Insurance Corporation to FCLT for
liquidation. Included in the assignment was the 4.75% interest. 

 In May of 2001, FCLT received a letter from R & R Investments. It read:

 Re: Willis Ranch Mineral Interests Joint Venture

 Percentage Interest - 4.750000%


 Dear Sirs:


 R & R Investments offers to purchase interest owned by FCLT Loans, L.P. in
the Willis Ranch Lease for $7,500.00 effective May 1, 2001.


 If you accept this offer, please sign below and send a copy of the letter back
to R & R Investments. At that time, also please prepare the assignment
conveying such interest to R & R. We will forward payment to you for the
purchase, as per your instructions. 


FCLT forwarded the R & R letter to Finger along with one of its own dated June 7, 2001. 
That of FCLT read:

 FCLT Loans, L.P. is the owner of 4.75% of the beneficial interest of the Willis
Ranch Joint Venture. It is my understanding that the only remaining assets
of that joint venture include cash and mineral interests that relate to the
property formerly held by the partnership. We have received that [sic]
attached offer for our interest in Willis Ranch Joint Venture. It is my
understanding that the partners have a right to purchase our ownership
percentage at a price equal to this offer. Please take whatever actions are
necessary to circulate the offer to the other owners to ascertain if they have
an interest in exercising their rights under the partnership agreement at this
price.


 Please let me know the partners' decision at your earliest convenience. 
Thank you for your help with this matter.


Finger sent the forgoing letter and attachment from R & R Investments to Haywood on June
19, 2001, along with a cover letter containing the words "please advise." Haywood did not
contact Finger about the missive, however. Nor did Finger attempt any further contact with
Haywood. Instead, Haywood waited for several weeks and called FCLT to determine if
Finger had bought the interest. (1) Apparently, no one returned his call. 

 Approximately a week later, i.e. on July 20th, Haywood again phoned FCLT and
eventually spoke with Brown, the entity's president. During that conversation, Brown
informed Haywood that the interest had not been sold to Finger. Haywood then stated that
he "believed [he] had the right to it, under the joint venture agreement, to purchase the
property since . . . Finger didn't do it within thirty days required in the . . . agreement." (2) 
Brown responded by telling Haywood "the Fingers were contesting that" and "I wasn't going
to sell it to anybody until the matter got cleared up." So too did he tell Haywood "that this
situation is confused and I'm not selling to Finger and I'm not selling to him [Haywood] until
the situation gets unconfused." 

 Shortly after the phone conversation between Haywood and Brown, Haywood sent
Brown, by certified mail, a letter containing the following:

 Be advised that, pursuant to the Willis Ranch Amended Joint Venture
Agreement, as owner of the interest formerly owned by the Maxwell Brothers,
I hereby elect to purchase your 4.75% interest in the joint venture. The sale
price of $7500.00 is immediately available for delivery to you, conditioned on,
an acceptable instrument conveying good title.


 As we discussed on the telephone this morning, time is of the essence. 
Please provide me a copy of the form you intend using to transfer the
property.


(Emphasis in original). The letter was dated July 20, 2001, and received by FCLT on July
23, 2001. Furthermore, Haywood testified at trial that he believed it constituted acceptance
of the offer to sell purportedly made by FCLT in the June 7th missive to Finger.

 At the heart of the dispute between the litigants lies the following proposition: was
the June 7th correspondence an offer by FCLT to sell the 4.75% joint venture interest for
$7500 or merely an invitation to negotiate? The trial court held that it was an offer,
determined that Haywood had accepted it, and compelled FCLT to convey the interest to
Haywood. 

 Analysis

 One may, at times, be entitled to the specific performance of a contract. However,
for a contract to arise there must be an offer, acceptance of the offer, and consideration. 
Harco Energy, Inc. v. Re-Entry People, Inc., 23 S.W.3d 389, 392 (Tex. App.-Amarillo 2000,
no pet.). Should any element go missing, then there is no contract. Moreover, and with
regard to the first element, authority dictates that the offer must be "certain and
unambiguous since the acceptance is required to be identical with the offer and without
certainty in the offer there is no meeting of the minds and no agreement." Morrow v. De
Vitt, 160 S.W.2d 977, 983 (Tex. App.-Amarillo 1942, writ ref'd w.o.m.); accord, Edmunds
v. Houston Power & Lighting Co., 472 S.W.2d 797, 798-99 (Tex. Civ. App.-Houston [14th
Dist.] 1971, writ ref'd n.r.e.) (stating that "for there to be an offer which may ripen into a
contract by a simple acceptance, the offer must be reasonably definite in its terms and must
sufficiently cover the essentials"). So too must it evince more than an invitation to engage
in negotiations, for the latter is not an offer capable of being accepted. Baldwin v. New, 736
S.W.2d 148, 152 (Tex. App.-Dallas 1987, writ denied). Which it is depends upon the intent
of those involved. Furthermore, this intent is garnered from the entire language of the
document itself, unless the language is ambiguous. Cross Timbers Oil Co. v. Exxon Corp.,
22 S.W.3d 24, 26 (Tex. App.-Amarillo 2000, no pet.). And, in assessing what was
intended, we assign to the words used their plain, ordinary, and generally accepted
meaning, unless the instrument requires otherwise. Id.; Sun Operating Ltd. Partnership v.
Holt, 984 S.W.2d 277, 285 (Tex. App.-Amarillo 1998, pet. denied); Phillips Petroleum Co.
v. Gillman, 593 S.W.2d 152, 154 (Tex. Civ. App.-Amarillo 1980, writ ref'd n.r.e.). With this
said we turn to the June 7th letter which purportedly contained the offer in question. (3) 

 In the letter, FCLT alluded to its position as owner of the 4.75% interest, its
"understanding" as to the remaining assets of the joint venture, the "offer" it received from
R & R, and its "understanding" as to the rights of the other joint venturers viz the opportunity
to acquire the interest before anyone else at the price mentioned in the R & R offer. Given
this right of first refusal, FCLT also directed Finger to "circulate" R & R's offer and assess
whether the joint venturers had an "interest" in exercising their right to acquire it at that
price. Obviously missing was any expressed statement of FCLT's desire or intent to sell to
anyone, and that such was missing was something Haywood admitted to at trial. (4) 
Additionally, the absence of same is important since the joint venture agreement to which
Finger and Haywood were bound mandated that the one desiring to sell "state his intention
to sell or dispose of his interest . . . ." Also missing from the June 7th letter were words
expressly offering the interest for sale to anyone. To this, Haywood also admitted. (5)

 In the place of expressed words of offer, FCLT asked Finger to determine whether
he or his co-owners had an "interest" in pursuing a transaction at the price mentioned by
R & R. This verbiage is akin to that used in In re Miller Estate, 43 Wash. C.R. 230 (Pa.
Orph. 1963). There, Wiley informed the administrator of Miller's estate of his desire to buy
a certain tract of land owned by the estate. The administrator eventually wrote Wiley telling
him that " [w]e finally have an asking price" for the land "which price is $15,000." Id. at 234.
Wiley was also told that a number of people had made inquiries about the property and "if
you are interested at the price quoted above, I would be pleased if you would let me know
within the next ten days . . . ." Id. at 234 (emphasis added). The trial court commented on
the meaning of the foregoing language in assessing whether the administrator's letter was
an offer to sell at $15,000. Before doing so, however, it also considered the writings of
various treatises on the subject of contracts. For instance, it quoted from comment (a) of
§25 of the Restatement (First) of Contracts wherein it was stated that 

 'It is often difficult to draw an exact line between offers and negotiations
preliminary thereto. It is common for one who wishes to make a bargain to
try to induce the other party to the intended transaction to make the definite
offer, he himself suggesting with more or less definiteness the nature of the
contract he is willing to enter into. Besides any direct language indicating an
intent to defer the formation of a contract, the definiteness or indefiniteness
of the words used in opening the negotiation must be considered, as well as
the usages of business and all accompanying circumstances.' 


In re Miller Estate, 43 Wash. C.R. at 242. Another commentator alluded to was Samuel
Williston via his Treatise on the Law of Contracts. The trial court quoted from §27 of volume
one of the third edition wherein Williston said:

 'Frequently negotiations for a contract are begun between parties by general
expressions of willingness to enter into a bargain upon stated terms and yet
the natural construction of the words and conduct of the parties is rather that
they are inviting offers, or suggesting the terms of a possible future bargain,
than making positive offers.' (6)

 

 In re Miller Estate, 43 Wash. C.R. at 242. And, after weighing the words in the
Restatement and Williston on Contracts, the trial court concluded that the "expressions"
contained in the administrator's letter "at most, constituted an offer to open negotiations,
and no more." Id. at 244-45. "Since it calls for a communication to the writer of [Wiley's]
interest in the matter, it repels the thought or idea that a contract would result by merely
mailing an acceptance." Id. (Emphasis added). The same is no less true here. The words
utilized by FCLT are quite plain and definite in their meaning. Yet, their definitiveness
relates not to any promise to sell at a particular price but rather to FCLT's desire to know
if any of the joint venturers had an "interest" in buying the property. There is a distinction
between tendering a promise to sell something at a certain price (e.g. I will sell you this car
for $1000) and inquiring into whether one would desire to buy something at a particular
price (e.g. would you be interested in buying this car for $1000). In the former, the speaker
is telling his audience that he will do something (i.e. sell) upon satisfaction of a particular
requirement (i.e. receiving a promise to pay $1000). The same is not true in the latter,
however. Left open is whether the speaker will do anything once the person hearing his
words responds with a promise to pay $1000; again, the speaker is simply inquiring into the
desires of his audience. 

 In short, and like those in In re Miller's Estate, the words utilized by FCLT "call[ed]
for a communication to the writer of [the joint venturers'] interest in the matter." Id. at 244-45 (emphasis added). The company did not promise to do anything once those interests
were revealed. So, like the words of the administrator in In re Miller's Estate, those written
by FCLT also "repel[] the . . . idea that a contract would result by merely mailing an
acceptance." Id. 

 Nor can we forget that irrespective of whether the June 7th letter was an offer, there
was no offer in existence when Haywood faxed his letter of acceptance to Brown on July
20th. By that time, Brown had informed him, during a prior telephone conversation, that
FCLT was not going to sell to anyone until all the confusion was resolved. One is free to
withdraw an offer before acceptance, Embree, Inc. v. Southwestern Bell Media, Inc., 772
S.W.2d 209, 210 (Tex. App.-Dallas 1989, writ denied), and Brown's words had the effect
of doing just that. Finally, a contract cannot arise through the acceptance of an offer that
was previously withdrawn. Id. at 211.

 In sum, to constitute an offer the words used must be certain and unambiguous. 
Asking one whether he has an interest in acquiring something falls short of that mark. It
exemplifies no promise but rather an intent to engage in negotiations. Accordingly, we
sustain FCLT's second issue, reverse the judgment of the trial court and render judgment
ordering that Haywood be denied recovery against FCLT. 


 Brian Quinn

 Justice



1. Apparently the first call was made around July 12, 2001.
2. The record discloses that the joint venture agreement gave Finger a right of first refusal to acquire
any interest in the venture which an owner offered to sell. Should that right not be exercised, then Haywood
had the right to accept the offer and buy the interest. 
3. Because the facts expressly pertinent to the issue before us are undisputed, we need only determine
if they support the conclusion that the June 7th letter was an offer. And, that can be determined as a matter
of law here. Edmunds v. Houston Power & Lighting Co., 472 S.W.2d 797, 798-99 (Tex. Civ. App.-Houston
[14th Dist.] 1971, writ ref'd n.r.e.) (because the relevant facts were not in dispute, the trial court concluded that
it was entitled to hold, as a matter of law, that the communication there involved was not an offer). 
4. When asked where in the letter FCLT expressly declared its intent to sell, Haywood replied: "[t]his
specific statement was not in there." 
5. When asked "[w]here in the letter is there a statement to the effect that First City is offering to sell
the interest . . . ," Haywood answered: "[t]here is no specific statement." However, he believed that the letter
was an offer because it directed Finger to circulate the missive "to the partners to see if they had any interest
in pursuing the purchase" and he (Haywood) had an interest in seeing that the joint venture "was complied
with." 
6. The same passage can be found at §4:7 of Williston's fourth edition. S. Williston & R. Lord, A
Treatise on the Law of Contracts §4:7 (4th ed. 1990).


serif"'>                                            ______________________________

 

 

                                                         ERIK
VALSON WOLFE,

 

Appellant

 

                                                                             v.

 

                                                        THE STATE OF TEXAS,

 

Appellee

                                         _________________________________

 

            FROM THE CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY;

 

                            NO.
0968532D; HON. MICHAEL THOMAS, PRESIDING

                                           _______________________________

 

                                                          On
Motion to Dismiss

                                           _______________________________

 

Before QUINN, C.J., and CAMPBELL and
PIRTLE, JJ.

Appellant Erik Valson
Wolfe, by and through his attorney, has filed a motion to dismiss his appeal
because he no longer desires to prosecute it. 
Without passing on the merits of the case, we grant the motion to
dismiss pursuant to Texas Rule of Appellate Procedure 42.2(a) and dismiss the appeal.  Having dismissed the appeal at appellant=s request, no motion for rehearing
will be entertained, and our mandate will issue forthwith.

 

Do
not publish.                                                         Per
Curiam