NO. 07-02-0424-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

APRIL 8, 2004
_____

ROBERT BROWN, TRUSTEE FOR FIRST CITY LIQUIDATING TRUST
AND MARVY FINGER, TRUSTEE FOR THE WILLIS RANCH JOINT VENTURE,

Appellants

v.

DAVID HAYWOOD,

Appellee
_____

FROM THE 75TH DISTRICT COURT OF LIBERTY COUNTY;

NO. 62,610; HON. J.C. ZBRANEK, PRESIDING
_____

Before JOHNSON, C.J., and QUINN and REAVIS, JJ.

A senior partner asked of his associate whether he "would believe that they settled the case for $1,000,000." In response, the associate responded in an excited voice: "we got $1,000,000?" To that the senior partner said, "no, I just wanted to know if you would believe that." An analogous play on words underlies this appeal.

Robert Brown (Brown), trustee for First City Liquidating Trust (FCLT), and Marvy Finger (Finger), trustee for the Willis Ranch Joint Venture, appeal from a judgment rendered in favor of David Haywood (Haywood). Through that judgment, the trial court

ordered FCLT to specifically perform a contract that it allegedly executed with Haywood. Under the purported agreement, FCLT promised to convey to Haywood its 4.75% interest in the Willis Ranch Joint Venture. Via four issues, Brown and Finger contend that the trial court erred. However, we need only consider the second issue for it is dispositive of this appeal. Through it, FCLT and Finger argue that the trial court erred in concluding that the June 7, 2001 letter sent by FCLT constituted an offer to sell the interest in question. We reverse and render judgment.

*Background*

Prior to June of 2001, Haywood owned a 50% interest in the Willis Ranch Joint Venture. The remainder of the interest was owned by other individuals or entities for whom Finger acted as trustee. However, due to the bankruptcy of an interest owner, First City Bank acquired the 4.75% interest at issue here. Thereafter, the bank failed and various of its assets were assigned by the Federal Deposit Insurance Corporation to FCLT for liquidation. Included in the assignment was the 4.75% interest.

In May of 2001, FCLT received a letter from R & R Investments. It read:

Re:  Willis Ranch Mineral Interests Joint Venture
     Percentage Interest - 4.750000%

Dear Sirs:

R & R Investments offers to purchase interest owned by FCLT Loans, L.P. in the Willis Ranch Lease for $7,500.00 effective May 1, 2001.

If you accept this offer, please sign below and send a copy of the letter back to R & R Investments. At that time, also please prepare the assignment conveying such interest to R & R. We will forward payment to you for the purchase, as per your instructions.

2

FCLT forwarded the R & R letter to Finger along with one of its own dated June 7, 2001. That of FCLT read:

> FCLT Loans, L.P. is the owner of 4.75% of the beneficial interest of the Willis Ranch Joint Venture. It is my understanding that the only remaining assets of that joint venture include cash and mineral interests that relate to the property formerly held by the partnership. We have received that [sic] attached offer for our interest in Willis Ranch Joint Venture. It is my understanding that the partners have a right to purchase our ownership percentage at a price equal to this offer. Please take whatever actions are necessary to circulate the offer to the other owners to ascertain if they have an interest in exercising their rights under the partnership agreement at this price.
>
> Please let me know the partners' decision at your earliest convenience. Thank you for your help with this matter.

Finger sent the forgoing letter and attachment from R & R Investments to Haywood on June 19, 2001, along with a cover letter containing the words "please advise." Haywood did not contact Finger about the missive, however. Nor did Finger attempt any further contact with Haywood. Instead, Haywood waited for several weeks and called FCLT to determine if Finger had bought the interest.[1] Apparently, no one returned his call.

Approximately a week later, *i.e.* on July 20th, Haywood again phoned FCLT and eventually spoke with Brown, the entity's president. During that conversation, Brown informed Haywood that the interest had not been sold to Finger. Haywood then stated that he "believed [he] had the right to it, under the joint venture agreement, to purchase the property since . . . Finger didn't do it within thirty days required in the . . . agreement."[2] Brown responded by telling Haywood "the Fingers were contesting that" and "I wasn't going

---

[1]Apparently the first call was made around July 12, 2001.

[2]The record discloses that the joint venture agreement gave Finger a right of first refusal to acquire any interest in the venture which an owner offered to sell. Should that right not be exercised, then Haywood had the right to accept the offer and buy the interest.

3

to sell it to anybody until the matter got cleared up." So too did he tell Haywood "that this situation is confused and I'm not selling to Finger and I'm not selling to him [Haywood] until the situation gets unconfused."

Shortly after the phone conversation between Haywood and Brown, Haywood sent Brown, by certified mail, a letter containing the following:

> Be advised that, pursuant to the Willis Ranch Amended Joint Venture Agreement, as owner of the interest formerly owned by the Maxwell Brothers, I hereby elect to purchase your 4.75% interest in the joint venture. The sale price of $7500.00 is immediately available for delivery to you, conditioned on, an acceptable instrument conveying *good title.*
>
> As we discussed on the telephone this morning, time is of the essence. Please provide me a copy of the form you intend using to transfer the property.

(Emphasis in original). The letter was dated July 20, 2001, and received by FCLT on July 23, 2001. Furthermore, Haywood testified at trial that he believed it constituted acceptance of the offer to sell purportedly made by FCLT in the June 7th missive to Finger.

At the heart of the dispute between the litigants lies the following proposition: was the June 7th correspondence an offer by FCLT to sell the 4.75% joint venture interest for $7500 or merely an invitation to negotiate? The trial court held that it was an offer, determined that Haywood had accepted it, and compelled FCLT to convey the interest to Haywood.

*Analysis*

One may, at times, be entitled to the specific performance of a contract. However, for a contract to arise there must be an offer, acceptance of the offer, and consideration. *Harco Energy, Inc. v. Re-Entry People, Inc.*, 23 S.W.3d 389, 392 (Tex. App.–Amarillo 2000, no pet.). Should any element go missing, then there is no contract. Moreover, and with

4

regard to the first element, authority dictates that the offer must be "certain and unambiguous since the acceptance is required to be identical with the offer and without certainty in the offer there is no meeting of the minds and no agreement." *Morrow v. De Vitt*, 160 S.W.2d 977, 983 (Tex. App.–Amarillo 1942, writ ref'd w.o.m.); *accord, Edmunds v. Houston Power & Lighting Co.*, 472 S.W.2d 797, 798-99 (Tex. Civ. App.–Houston [14th Dist.] 1971, writ ref'd n.r.e.) (stating that "for there to be an offer which may ripen into a contract by a simple acceptance, the offer must be reasonably definite in its terms and must sufficiently cover the essentials"). So too must it evince more than an invitation to engage in negotiations, for the latter is not an offer capable of being accepted. *Baldwin v. New*, 736 S.W.2d 148, 152 (Tex. App.–Dallas 1987, writ denied). Which it is depends upon the intent of those involved. Furthermore, this intent is garnered from the entire language of the document itself, unless the language is ambiguous. *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex. App.–Amarillo 2000, no pet.). And, in assessing what was intended, we assign to the words used their plain, ordinary, and generally accepted meaning, unless the instrument requires otherwise. *Id.*; *Sun Operating Ltd. Partnership v. Holt*, 984 S.W.2d 277, 285 (Tex. App.–Amarillo 1998, pet. denied); *Phillips Petroleum Co. v. Gillman*, 593 S.W.2d 152, 154 (Tex. Civ. App.–Amarillo 1980, writ ref'd n.r.e.). With this said we turn to the June 7th letter which purportedly contained the offer in question.[3]

In the letter, FCLT alluded to its position as owner of the 4.75% interest, its "understanding" as to the remaining assets of the joint venture, the "offer" it received from

---

[3]Because the facts expressly pertinent to the issue before us are undisputed, we need only determine if they support the conclusion that the June 7th letter was an offer. And, that can be determined as a matter of law here. *Edmunds v. Houston Power & Lighting Co.*, 472 S.W.2d 797, 798-99 (Tex. Civ. App.–Houston [14th Dist.] 1971, writ ref'd n.r.e.) (because the relevant facts were not in dispute, the trial court concluded that it was entitled to hold, as a matter of law, that the communication there involved was not an offer).

R & R, and its "understanding" as to the rights of the other joint venturers *viz* the opportunity to acquire the interest before anyone else at the price mentioned in the R & R offer. Given this right of first refusal, FCLT also directed Finger to "circulate" *R & R's offer* and assess whether the joint venturers had an "interest" in exercising their right to acquire it at that price. Obviously missing was any expressed statement of FCLT's desire or intent to sell to anyone, and that such was missing was something Haywood admitted to at trial.[4] Additionally, the absence of same is important since the joint venture agreement to which Finger and Haywood were bound mandated that the one desiring to sell "state his intention to sell or dispose of his interest . . . ." Also missing from the June 7th letter were words expressly offering the interest for sale to anyone. To this, Haywood also admitted.[5]

In the place of expressed words of offer, FCLT asked Finger to determine whether he or his co-owners had an "interest" in pursuing a transaction at the price mentioned by R & R. This verbiage is akin to that used in *In re Miller Estate*, 43 Wash. C.R. 230 (Pa. Orph. 1963). There, Wiley informed the administrator of Miller's estate of his desire to buy a certain tract of land owned by the estate. The administrator eventually wrote Wiley telling him that " [w]e finally have an asking price" for the land "which price is $15,000." *Id.* at 234. Wiley was also told that a number of people had made inquiries about the property and "if you are *interested* at the price quoted above, I would be pleased if you would let me know

---

[4]When asked where in the letter FCLT expressly declared its intent to sell, Haywood replied: "[t]his specific statement was not in there."

[5]When asked "[w]here in the letter is there a statement to the effect that First City is offering to sell the interest . . . ," Haywood answered: "[t]here is no specific statement." However, he believed that the letter was an offer because it directed Finger to circulate the missive "to the partners to see if they had any interest in pursuing the purchase" and he (Haywood) had an interest in seeing that the joint venture "was complied with."

within the next ten days . . . ." *Id.* at 234 (emphasis added). The trial court commented on the meaning of the foregoing language in assessing whether the administrator's letter was an offer to sell at $15,000. Before doing so, however, it also considered the writings of various treatises on the subject of contracts. For instance, it quoted from comment (a) of §25 of the Restatement (First) of Contracts wherein it was stated that

> 'It is often difficult to draw an exact line between offers and negotiations preliminary thereto. It is common for one who wishes to make a bargain to try to induce the other party to the intended transaction to make the definite offer, he himself suggesting with more or less definiteness the nature of the contract he is willing to enter into. Besides any direct language indicating an intent to defer the formation of a contract, the definiteness or indefiniteness of the words used in opening the negotiation must be considered, as well as the usages of business and all accompanying circumstances.'

*In re Miller Estate*, 43 Wash. C.R. at 242. Another commentator alluded to was Samuel Williston via his Treatise on the Law of Contracts. The trial court quoted from §27 of volume one of the third edition wherein Williston said:

> 'Frequently negotiations for a contract are begun between parties by general expressions of willingness to enter into a bargain upon stated terms and yet the natural construction of the words and conduct of the parties is rather that they are inviting offers, or suggesting the terms of a possible future bargain, than making positive offers.'[6]

*In re Miller Estate*, 43 Wash. C.R. at 242. And, after weighing the words in the Restatement and Williston on Contracts, the trial court concluded that the "expressions" contained in the administrator's letter "at most, constituted an offer to open negotiations, and no more." *Id.* at 244-45. "Since it calls for a communication to the writer of [Wiley's] *interest* in the matter, it repels the thought or idea that a contract would result by merely

---

[6]The same passage can be found at §4:7 of Williston's fourth edition. S. Williston & R. Lord, *A Treatise on the Law of Contracts* §4:7 (4th ed. 1990).

7

mailing an acceptance." *Id.* (Emphasis added). The same is no less true here. The words utilized by FCLT are quite plain and definite in their meaning. Yet, their definitiveness relates not to any promise to sell at a particular price but rather to FCLT's desire to know if any of the joint venturers had an "interest" in buying the property. There is a distinction between tendering a promise to sell something at a certain price (*e.g.* I will sell you this car for $1000) and inquiring into whether one would desire to buy something at a particular price (*e.g.* would you be interested in buying this car for $1000). In the former, the speaker is telling his audience that he will do something (*i.e.* sell) upon satisfaction of a particular requirement (*i.e.* receiving a promise to pay $1000). The same is not true in the latter, however. Left open is whether the speaker will do anything once the person hearing his words responds with a promise to pay $1000; again, the speaker is simply inquiring into the desires of his audience.

In short, and like those in *In re Miller's Estate*, the words utilized by FCLT "call[ed] for a communication to the writer of [the joint venturers'] *interest* in the matter." *Id.* at 244-45 (emphasis added). The company did not promise to do anything once those interests were revealed. So, like the words of the administrator in *In re Miller's Estate*, those written by FCLT also "repel[] the . . . idea that a contract would result by merely mailing an acceptance." *Id.*

Nor can we forget that irrespective of whether the June 7th letter was an offer, there was no offer in existence when Haywood faxed his letter of acceptance to Brown on July 20th. By that time, Brown had informed him, during a prior telephone conversation, that FCLT was not going to sell to anyone until all the confusion was resolved. One is free to

8

withdraw an offer before acceptance, *Embree, Inc. v. Southwestern Bell Media, Inc.,* 772 S.W.2d 209, 210 (Tex. App.–Dallas 1989, writ denied), and Brown's words had the effect of doing just that.  Finally, a contract cannot arise through the acceptance of an offer that was previously withdrawn. *Id.* at 211.

In sum, to constitute an offer the words used must be certain and unambiguous. Asking one whether he has an interest in acquiring something falls short of that mark.  It exemplifies no promise but rather an intent to engage in negotiations.  Accordingly, we sustain FCLT's second issue, reverse the judgment of the trial court and render judgment ordering that Haywood be denied recovery against FCLT.


Brian Quinn
Justice