CROSS TIMBERS OIL CO., Appellant,

v.

EXXON CORPORATION, d/b/a Exxon Co., U.S.A., Domain Energy Ventures Corporation, Robert O. Clark, Jacqueline Powell, Harriet S. Stevens, and Gene Warr as Trustee of Security Trust, Appellee.

No. 07–99–0138–CV.

Court of Appeals of Texas, Amarillo.

March 30, 2000.

Rehearing Overruled May 1, 2000.

Steven C. Kiser, Michael J. Goeke, M. Michele Green, Lynch, Chappell & Alsup, Midland, for appellant.

Clay Barton, Mark Domel, McGinnis, Lochridge & Killgore, L.L.P., Austin, Ernest C. Terry, Exxon Co., U.S.A., Houston, for appellee.

Before QUINN and REAVIS and JOHNSON, JJ.

BRIAN QUINN, Justice.

Cross Timbers Oil Company (Cross Timbers) appeals from a final summary judgment entered in favor of Exxon Corporation, d/b/a Exxon Company, U.S.A. (Exxon). Through that judgment, the trial court purportedly denied Cross Timbers all relief against Exxon.[1] On appeal, Cross Timbers asserts five issues which effectively attack the trial court's decision to grant Exxon's motion for summary judgment while denying its own. We affirm.

### Background

Both Cross Timbers and Exxon were successors in interest to two agreements involving the production of oil and gas. The first consisted of an accord unitizing various oil and gas interests in the San Andreas pay zone in Yoakum County (the Unit Agreement) while the second concerned the operation of the unitized interests (Operating Agreement). The two were executed in February of 1965. As previously mentioned, neither Cross Timbers nor Exxon were original parties to the agreements. Both eventually came to own a working interest and, thereafter, Exxon also assumed the role of operator

---

1. We say purportedly because the written instrument itself merely "granted" Exxon's motion and "denied" that of Cross Timbers. The ultimate disposition of the rights in question went unmentioned, except for the statement that "[a]ll relief not expressly granted herein is denied."

under the Operating Agreement. Moreover, the dispute before us arose from Exxon's position as operator.

In late 1997, Cross Timbers sought to replace Exxon as the operator. It did so by invoking various sections of the Operating Agreement. The sections allegedly vested the working interest owners with authority to exercise "overall control and supervision of all matters pertaining to Unit operations" and to so supervise the operations through the vote of the working interest owners.[2] So, pursuant to those sections, Cross Timbers informed the working interest owners of its intent, solicited the approval of the requisite number of working interest owners and garnered sufficient vote. When Exxon was informed of this and told to relinquish its post, it refused to step down. Subsequently, Cross Timbers sued Exxon for breach of contract, contending that the latter violated the agreement by failing to capitulate. Both parties moved for summary judgment. The trial court granted that of Exxon but did not specify the particular ground upon which it relied.

### Standard of Review

The standard of review applicable when considering orders granting summary judgment is well known and need not be repeated. We find it sufficient to simply refer the litigants to *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910 (Tex. 1997) and *Nixon v. Mr. Property Management Co. Inc.*, 690 S.W.2d 546 (Tex.1985).

■ Next, resolution of this dispute entails interpretation of the contracts involved. In doing so, we again apply various settled rules of law. The first mandates that construing an unambiguous contract involves a question of law. *Borders v. KRLB, Inc.*, 727 S.W.2d 357, 359 (Tex.App.—Amarillo 1987, writ ref'd n.r.e.). Thus, we need not defer to any interpretation afforded by the trial court.

Second, when interpreting an instrument, we strive to give effect to its parties' intent. *Id.* Furthermore, that intent is garnered from the language of the contract, which language is considered in its entirety. *Id.* That is, we peruse the complete document to understand, harmonize, and effectuate all its provisions. *Questa Energy Corp. v. Vantage Point Energy, Inc.*, 887 S.W.2d 217, 221 (Tex.App.—Amarillo 1994, writ denied). So too must we afford the words contained in the agreement their plain, ordinary, and generally accepted meaning, unless the instrument requires otherwise. *Sun Operating, Ltd. v. Holt*, 984 S.W.2d 277, 285 (Tex.App.—Amarillo 1998, pet. denied); *Phillips Petroleum Co. v. Gillman*, 593 S.W.2d 152, 154 (Tex.Civ.App.—Amarillo 1980, writ ref'd. n.r.e.).

■ Finally, in applying the foregoing rules we may not rewrite the agreement to mean something it did not. *Borders v. KRLB, Inc.*, 727 S.W.2d at 359. Simply put, we cannot change the contract merely because we or one of the parties comes to dislike its provisions or thinks that something else is needed in it. *HECI Explor. Co. v. Neel*, 982 S.W.2d 881, 888–89 (Tex. 1998). This is so because parties to the contract are considered masters of their own choices. They are entitled to select what terms and provisions to include in a contract before executing it. And, in so choosing, each is entitled to rely upon the words selected to demarcate their respective obligations and rights. In short, the parties strike the deal *they* choose to strike and, thus, voluntarily bind themselves in the manner *they* choose. And, that is why parties are bound by their agreement as written. *Emmer v. Phillips Petroleum Co.*, 668 S.W.2d 487, 490 (Tex. App.—Amarillo 1984, no writ). For a court to change the parties' agreement merely because the Court did not like the

---

**2.** It took an affirmative vote of 65% of the working interest owners to decide "all matters" before them.

agreement, or because one of the parties subsequently found it distasteful, would be to undermine not only the sanctity afforded the contract but also the expectations of those who created and relied upon it.

With the foregoing said, we now turn to the first and second issues raised by Cross Timbers.

### Points One and Two

■ Through points one and two, Cross Timbers asserts that the trial court erred in granting its opponent a summary judgment. This is so because specific provisions of the Operating Agreement and the Unit Agreement allegedly permitted the working interest owners to remove Exxon by the vote of the working interest owners.[3] We disagree and overrule the two points. The sections of the two agreements which purportedly create the right in dispute follow. The first, found in the Operating Agreement, states:

3.1 *Overall Supervision.* Working Interest Owners shall exercise overall supervision and control of all matters pertaining to Unit Operations pursuant to this agreement and the Unit Agreement. . . .

The second, found in the Unit Agreement, reads:

4.3 *Change of Operating Methods.* Nothing herein shall prevent Working Interest Owners from discontinuing or changing in whole or in part any method of operation which, in their opinion, is no longer in accord with good engineering or production practices. Other methods of operation may be conducted or changes may be made by Working Interest Owners from time to time if determined by them to be feasible, necessary, or desirable to increase the ultimate recovery of Unitized Substances.

Together they supposedly illustrate the intent to grant the working interest owners authority to remove the operator as part of their power to "supervis[e] and control . . . operations" and change the "method of operation." Unlike Cross Timbers, however, we do not so construe the provisions when viewed in conjunction with other sections of the contract.

Neither agreement defines the term "operations." Nevertheless, following article 3.1 of the Operating Agreement is a non-exclusive list of powers extended to the working interest owners. Found under section 3.2, they include the authority to determine the method of operation; the wells to be drilled; recompleted, abandoned, or changed; the amount of expenditures in excess of $25,000 which can be made; and, the ultimate disposition of unit equipment. Similarly, section 4.3 of the Unit Agreement uses the phrase "method of operation." This itemization is telling for it provides evidence as to what was intended by the parties when the contracts were drawn. For instance, this court has recognized that the word "operations" means the "overall process aimed at achieving a particular end." *Sun Operating Ltd. v. Holt,* 984 S.W.2d at 285. So, reference to the "method of operation" would necessarily allude to the process by which the desired end was achieved; in other words, it refers to *how* the unitized tract would be developed and minerals produced. In turn, allusion under section 3.2 *et. seq.* of the Operating Agreement to which wells are to be drilled, reworked, abandoned, or changed, the expenditures which can be made, and the disposition of unit equipment concern *what* can be done, *where* it can be done, and *when* it can be done.

Moreover, absent from each of the aforementioned sections is express reference to *who* can carry out the how, what,

---

3. No one argues that the specific provisions in dispute were or are ambiguous. Indeed, both litigants contend that they are not. Thus, the question before us is narrow and concerns the interpretation of the specific provisions relied upon by Cross Timbers in support of its alleged right to remove.

where, and when dictated by the working interest owners. Instead, that issue is specifically addressed elsewhere in both the Operating Agreement and Unit Agreement. That is, under section 7.1 of the former we are told that "[s]ubject to the provisions of this agreement and to instructions from Working Interest Owners, *Unit Operator shall have the exclusive right and be obligated to conduct* Unit Operations." (Emphasis added). In turn, section 4.1 of the Unit Agreement dictates that the ". . . *Unit Operator shall have the exclusive right to conduct* Unit Operations." (Emphasis added).[4] As can be seen, both sections 7.1 and 4.1 vest the right to *conduct* the operations in the operator to the exclusion of everyone else. And in so granting the right, they dictate *who* may and must perform the how, what, where, and when decided upon by the working interest owners.

In short, the two agreements create a clear division of authority. The working interest owners determine what to do and how to do it while the operator fulfills their directive. To somehow read section 3.1 of the Operating Agreement and section 4.3 of the Unit Agreement as permitting the working interest owners to remove an operator would be to blur this clear division. So too would it be tantamount to 1) ignoring the intent of the parties as expressed by their own written words and, 2) unilaterally rewriting the contracts to afford the working interest owners the right to conduct operations by replacing operators at their choosing. This we cannot do. *Borders v. KRLB, Inc., supra.* Simply put, and contrary to the supposition of Cross Timbers, neither section can reasonably be read as allowing the working interest owners to remove the unit operator, and we so hold as a matter of law. Thus, the trial

court did not err in granting summary judgment to Exxon.

Deciding points one and two as we do relieves us from having to address Cross Timbers' remaining issues. Accordingly, the summary judgment is affirmed.

---

4. The Unit Agreement continues by stating not only that "[t]he operations shall conform to the provisions of this agreement and the Unit Operating Agreement [but also] that [i]f there is any conflict between such agreements, this agreement shall govern." Because the terms of the Unit Agreement supercede those of the Operating Agreement when conflict arises between the two, Cross Timbers' proposition that section 7.1 somehow conditions the operator's exclusive right to conduct operations is misplaced. This is so because any conditions contained in section 7.1 of the Operating Agreement are omitted from section 4.1 of the Unit Agreement, and the latter controls any conflict.