NO. 07-05-0327-CV


IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



JUNE 14, 2007



_____________________




PETRO PRO, LTD., L&R ENERGY CORPORATION, NANCY WILSON BRISCOE, JUDITH BROCK SEITZ, AND CAROLYN ROGERS, APPELLANTS


V.



UPLAND RESOURCES, INC., KCS RESOURCES, INC., GREAT LAKES ENERGY


 PARTNERS, L.L.C., AND STEVE ZEMKOSKI, APPELLEES



_________________________________



FROM THE 31ST DISTRICT COURT OF ROBERTS COUNTY;



NO. 1893; HONORABLE STEVEN R. EMMERT, JUDGE



_______________________________




Before CAMPBELL and HANCOCK and PIRTLE, JJ.

OPINION

 This appeal concerns a dispute between assignors, assignees, and intervening
royalty owners regarding the construction of two oil and gas wellbore assignments, wherein
the assignments expressly limited the assigned interest to "rights in the wellbore" of a given
well. Presenting similar issues, Appellants, Petro Pro, Ltd. and L&R Energy Corporation,
and Intervenors, Nancy Wilson Briscoe, Judith Brock Seitz, and Carolyn Rogers, appeal
the denial of their respective motions for summary judgment and the grant of summary
judgment in favor of appellees, Upland Resources, Inc., KCS Resources, Inc., Great Lakes
Energy Partners, L.L.C., and Steve Zemkoski. By their issues, Appellants and Intervenors
contend the trial court misconstrued the nature and scope of the assigned interest. 
Appellants also appeal the denial of their motion to have funds tendered into the court's
registry. We reverse and render judgment declaring the rights of the parties as to those
issues before the trial court. (1)

Background Facts 

Original Oil and Gas Leases


 The two assignments in question pertain to rights in the wellbore of the King "F" No.
2 gas well, located on a 704-acre pooled gas unit in Roberts County. The material facts
surrounding the well are not disputed. In September 1992 and 1993, Upland Resources,
Inc. (hereinafter individually referred to as "Upland Resources") entered into five oil, gas,
and mineral leases involving separate tracts of land in Roberts County. In 1993, Medallion
Production Company ("Medallion") acquired the leasehold and spud the King "F" No. 2 well
on one of the leased tracts consisting of 500 acres. The tract covered multiple gas-producing formations, including the Brown Dolomite formation, located at depths of
approximately 3,400 to 3,600 feet, and the Cleveland formation, located approximately
6,500 to 6,600 feet beneath the surface. The King "F" No. 2 well was completed as a gas
well in the Cleveland formation and produced gas in paying quantities. Several months
after the well was completed, Medallion pooled the 500-acre tract with 204 acres from an
adjacent tract to create an irregular shaped, 704-acre gas unit. The leasehold interest in
the 704-acre unit was subsequently acquired by KCS Medallion Resources ("KCS") and
MB Operating Co., Inc. ("MB"). Eventually, the leasehold area situated horizontally outside
the 704-acre unit and vertically below 6,800 feet was released. 

"Wellbore Only" Assignments


 In 1998, for reasons undisclosed in the record, KCS and MB decided that the King
"F" No. 2 well was no longer economically viable. Consequently, in November of that year,
KCS and MB sold their interests in the well at an auction of oil and gas properties. The
winning bidder, L&R Energy ("L&R"), received the interests from KCS and MB via the two
assignments in controversy. The assignments were identical in that they both conveyed
the following:

 All of Seller's right, title and interest in and to the oil and gas leases
described in Exhibit "A" attached hereto and made a part hereof ("Subject
Leases") insofar and only insofar as said leases cover rights in the wellbore
of the King "F" No. 2 Well.


(Emphasis added). Pursuant to the express terms of the assignments, L&R's leasehold
interest became effective on December 1, 1998.

New Development Activity


 Several years after the assignments, operators in the area began drilling and
completing gas wells in the shallower Brown Dolomite formation. In May 2003, pursuant
to a farmout agreement with KCS, Upland Resources entered the pooled gas unit and
completed a horizontal gas well in the Brown Dolomite formation. The well, dubbed the
Skeeterbee No. 1, traversed within 600 feet of the King "F" No. 2 well. By June 2004,
Upland Resources had completed two more gas wells within the 704-acre pooled gas unit,
the horizontal Skeeterbee No. 2 and the vertical Skeeterbee No. 3. Both those wells were
completed in the Brown Dolomite formation. 

 Meanwhile, in April 2004, L&R assigned its interest in the King "F" No. 2 well to
Petro Pro Ltd. (hereinafter individually referred to as "Petro Pro"). Concerned with Upland
Resource's drilling activities, Petro Pro sent a letter to Upland Resources and KCS
requesting that both parties clarify their respective interests in the pooled gas unit. Both
parties promptly responded with letters stating their belief that Petro Pro did not acquire
any leasehold interest outside the confines of the King "F" No. 2 wellbore. Petro Pro
replied with a letter stating claims for trespass and conversion and demanding that
Appellees vacate the leasehold and cease production from the Skeeterbee wells. 

Suit Filed


 Finally, in September 2004, citing Upland Resources and KCS's refusal to resolve
the dispute, Petro Pro and L&R (hereinafter collectively referred to as "Petro") filed the
underlying suit against Upland, KCS, and other interested parties, Great Lakes Energy
Partners, L.L.C., and Steve Zemkoski (hereinafter collectively referred to as "Upland") for
trespass, bad faith trespass, conversion, and money had and received. Petro claimed they
owned the exclusive right to produce gas from the entire 704-acre pooled gas unit, from
the surface to a depth of 6,800 feet. Petro also sought a declaratory judgment declaring
the property rights and ownership interests acquired by the respective parties by virtue of
the assignments and an accounting of all proceeds from the sale of gas produced from the
Skeeterbee wells. Petro also filed a motion requesting that any production revenue from
the Skeeterbee wells be placed into the court's registry until the dispute was resolved. 
Upland initially responded to the allegations by filing a general denial. Upon learning of the
pending dispute between Petro and Upland, the royalty interest owners in the 704-acre
pooled gas unit, Nancy Wilson Briscoe, Judith Brock Seitz, and Carolyn Rogers
(hereinafter collectively referred to as "Intervenors") filed a plea of intervention seeking
damages for the alleged breach of implied covenants and for tortious interference with
existing contracts. Intervenors contended that Petro's lawsuit and wrongful claims of
ownership prevented Upland from fully developing the lease and protecting the lease from
drainage from adjacent wells. 

Competing Motions for Summary Judgment


 On February 1, 2005, Upland filed a motion for summary judgment contending that
Petro's rights were limited to the right to produce gas from the Cleveland formation only
and the right to "enhance" that production. Upland further contended that Petro's rights
were restricted to the physical confines of the King "F" No. 2 well only, without the right to
deepen the well to other zones or horizons, or the right to perforate the wellbore casing for
the purpose of producing any other zone or horizon lying between the surface and the
presently producing section of the Cleveland formation. Subsequently, Intervenors filed
a motion for partial summary judgment contending Petro had the right to produce from any
formation subject to governmental regulations, which limited the horizontal extent of Petro's
rights to forty acres surrounding the King "F" No. 2 wellbore. Finally, Petro filed their own
motion for summary judgment restating their position that they were the exclusive owners
of any portion of leasehold estate that could "reasonably be reached and produced"
through the King "F" No. 2 wellbore.

The Trial Court's Judgment


 Following hearings on the parties' competing motions for summary judgment, the 
trial court ruled that the King "F" No. 2 wellbore assignments were unambiguous and
granted Upland Resources's motion for summary judgment. The judgment further stated
that "[j]udgment is entered in favor of [Upland Resources]." The court denied Petro and
Intervenors' motions for summary judgment and Petro's motion to have funds from
production tendered into the court's registry. The trial court also severed and abated
Intervenors' damage claims against Petro. 

 As drafted, the trial court's judgment does not set forth a declaration of the interest
and rights conveyed by the assignments. (2) From the four corners of the judgment, we are
left to speculate as to exactly what the trial court determined the rights of the parties under
the assignments to be. A properly drafted declaratory judgment should terminate the
uncertainty or controversy giving rise to suit by declaring the rights of the parties as to
those matters upon which the parties joined issue. Calvert v. Employees Ret. Sys. of Tex.,
648 S.W.2d 418, 419-20 (Tex.App.-Austin 1983, writ ref'd n.r.e.). See generally Robert
W. Calvert, Declaratory Judgments in Texas - Mandatory or Discretionary?, 14 St.Mary's
L.J. 1 (1982). Notwithstanding the fact that the parties may have drafted the judgment and
submitted it to the trial court "approved as to form," the failure of the judgment to
specifically declare those rights was error. 

 In a situation where all parties have moved for summary judgment and one motion
is granted and the others are denied, the appellate court should review all parties summary
judgment evidence and determine all questions presented. Bradley v. State ex rel. White,
990 S.W.2d 245, 247 (Tex. 1999). See also Tex. R. App. P. 43.2(c). The reviewing court
should then render the judgment that the trial court should have rendered. Bradley, 990
S.W.2d at 247. The questions presented in this case are, what interest is conveyed by the
assignments, and what are the rights of the parties? Therefore, this Court will construe the
assignments in question and declare the interests conveyed and rights of the parties as to
those matters upon which the parties have joined issue. By this appeal, Petro and Intervenors urge us to adopt their respective
interpretations of the wellbore assignments and contend they are entitled to judgment as
a matter of law. Upland Resources, meanwhile, maintains that the trial court correctly
construed the assignments in their favor. As previously stated, the trial court's construction
is not readily apparent from the face of the judgment. Because a declaration of the
property rights and ownership interests of the parties is a matter of law where the
instrument is unambiguous, we will examine the assignment language to determine the
actual interest conveyed. In doing so, we begin by determining the applicability of some
established canons of contract construction.

Applicability of Canons of Contract Construction

 The goal when construing an unambiguous agreement is to determine and give
effect to the parties' intent as expressed within the "four corners" of the instrument. See
Gulf Ins. Co. v. Burns Motors, Inc., 22 S.W.3d 417, 423 (Tex. 2000); Luckel v. White, 819
S.W.2d 459, 461-63 (Tex. 1991). Such intent is garnered from the language used in the
writing when read as a whole. Cross Timbers Oil Co. v. Exxon Corp., 22 S.W.3d 24, 26
(Tex.App.-Amarillo 2000, no pet.). Stated differently, we must analyze the entire
instrument to understand and harmonize all parts of the instrument so as to give effect to
all of its provisions. Luckel, 819 S.W.2d at 462; Questa Energy Corp. v. Vantage Point
Energy, Inc., 887 S.W.2d 217, 221 (Tex.App.-Amarillo 1994, writ denied). Construction
of an unambiguous instrument is a question of law to be resolved by the court. Luckel, 819
S.W.2d at 461. We afford the words contained in the agreement their plain, ordinary, and
generally accepted meanings, unless the instrument requires otherwise. E.g., Cross
Timbers, 22 S.W.3d at 27-28; Sun Operating Ltd. Partnership v. Holt, 984 S.W.2d 277, 285
(Tex.App.-Amarillo 1998, pet. denied).

 By their brief, Petro contends that the absence of express limiting language means
that Upland intended to assign their leasehold interest in the entire 704-acre pooled gas
unit, including the right to extend one or more horizontal drainholes from the King "F" No.
2 wellbore into other productive areas of the lease. Similarly, Petro insists that the
conveyance of "[a]ll of Seller's right, title and interest" in the leases gives them title to all
the oil, gas, and minerals beneath the leasehold regardless of where it is located. Petro
contends that this interpretation is consistent with the various canons of construction that
pertain to conveyances of real property, namely the canon to "construe in favor of the
grantee" and the canon of "conveyance of the greatest estate," which they claim is
embodied in § 5.001(a) of the Property Code. (3) Furthermore, Petro urges us to consider
Upland's actions with respect to other assignments, which are unrelated to the present
case but contain similar language.

 At the opposite extreme, Upland contends that the assignments should be
construed in light of the facts as they existed at the time of conveyance, thereby restricting
Petro's rights to the production of gas from the existing wellbore and the Cleveland
formation only. While Intervenors agree that operations should be confined to the existing
wellbore, they claim that Petro's rights should be construed in such a way that they are
limited, in accordance with Railroad Commission well density rules, to an undetermined
forty surface acres surrounding the wellbore. Intervenors further contend that the
assignments should be construed so as to allow Petro the right to plug back the wellbore
and recomplete the well in the Brown Dolomite formation.

 If, after application of the canons of contract construction, an agreement is
susceptible of only one reasonable meaning, the contract is unambiguous. The
construction of a written, unambiguous instrument is a question of law for the court. See
OTC Petroleum Corp. v. Brock Exploration Corp., 835 S.W.2d 792, 794 (Tex.App.-Amarillo
1992, writ denied). In such instance, the courts will give effect to the objective intention of
the parties as expressed or as is apparent in the writing, since the parties generally intend
every clause to have some effect and in some measure to evidence their agreement. Id. 
Also, extrinsic evidence of other assignments is irrelevant to the parties' intentions in the
present case. See Neel v. Alpar Resources, Inc., 797 S.W.2d 361, 363-66
(Tex.App.-Amarillo 1990, no writ) (explaining that an unambiguous instrument will be
enforced as written and without consideration of other instruments).

 When construing agreements, an agreement which is worded in such a fashion that
it can be given a certain or definite legal meaning is not ambiguous and will be enforced
as written. HECI Exploration Co. v. Neel, 982 S.W.2d 881, 888-89 (Tex. 1998). Here,
none of the parties allege that the assignments are ambiguous, and we agree that they are
not. Therefore, we restrict our analysis to the plain language of the assignments to
determine the nature and scope of the assigned interest. See Yzaguirre v. KCS
Resources, Inc., 53 S.W.3d 368, 372-73 (Tex. 2001).



Nature and Scope of the Assigned Interest 

 As recited above, the assignment language describes the assigned interest as "[a]ll
of Seller's right, title and interest in and to the oil and gas leases . . . insofar and only
insofar as said leases cover rights in the wellbore of the King "F" No. 2 Well." While the
parties agree that this language unambiguously assigns leasehold rights in the King "F" No.
2 wellbore, their interpretations regarding the nature and extent of the estate conveyed
differ greatly. 

 An oil and gas lease conveys an interest in real property, as does the assignment
of all or a portion thereof. Cherokee Water Co. v. Forderhause, 641 S.W.2d 522, 525
(Tex. 1982); ExxonMobil Corp. v. Valence Operating Co., 174 S.W.3d 303
(Tex.App.-Houston [1st Dist.] 2005, pet. denied). A lessee under an oil and gas lease
owns a determinable fee in the oil and gas in place. Cherokee Water Co., 641 S.W.2d at
525. In this case, the estate conveyed was part of the leasehold estate created by the
underlying oil and gas leases. Therefore, the assignments assigned to Petro a
determinable fee interest in the oil and gas in place. 

 Like the phrase "subject to," the phrase "insofar and only insofar" constitutes a
limitation of the grant. See, e.g., Walker v. Foss, 930 S.W.2d 701, 707 (Tex.App.-San
Antonio 1996, no writ) (stating that the principal function of such a limitation is protecting
the grantor against a claimed breach of warranty). It neither conveys an interest to the
assignee, nor does it reserve or retain an interest in favor of the assignor. It merely limits
the extent of the interest granted. Id. at 706-07. Consequently, it does not serve to limit
the "rights" conveyed to Petro, nor does it reserve to Upland any exclusive rights. 
Therefore, the assignee, in this case Petro, received all of the rights appurtenant to the
estate conveyed. So, what was the estate conveyed and what are the rights appurtenant
thereto?

Estate Conveyed


 To settle this dispute and define the estate conveyed, we must first determine the
depth (vertical rights) and area (horizontal rights) covered by the assignments. See
Lawrence P. Terrell, Limited Assignments-Who Gets What?, 35 Rocky Mtn. Min. L. Inst.
17, § 17.02 (1989) (explaining that careful consideration of these two elements is essential
to defining the interests transferred and retained). See also Kurt M. Peterson, Wellbores:
Shedding Light on a Transactional Black Hole, 48 Rocky Mtn. Min. L. Inst. 13, §13.08[3][d]
(2002). This information, in turn, will allow us to define the extent of assignees' leasehold
rights in the King "F" No. 2 wellbore.

Vertical Limit of Assignment


 Regarding this issue, Upland contends that the "plain, grammatical meaning" of the
words used in the assignments limits the assigned interest to the horizon that was open
in the wellbore on the date of the assignments. In other words, Upland claims Petro's
rights are strictly limited to the Cleveland formation. But adopting this stance would be
inserting language into the assignments that does not exist. Furthermore, it would require
a determination of the facts, outside the four corners of the assignment, to ascertain the
extent of the interest transferred. Contrary to Upland's contention, the assignments are
completely devoid of language limiting Petro's leasehold interest to the Cleveland
formation. Without such limiting language, we find no support for Upland's contention and
agree with Petro and Intervenors' contention that the assignment language does not limit
wellbore operations to a specific depth or formation. Therefore, we hold that the vertical
limit of the assignments is defined by the depth of the wellbore as assigned.

Horizontal Limit of Assignment


 Similarly, there is a lack of support for Petro's claim that they acquired horizontal
rights coextensive with the 704-acre pooled gas unit and Intervenors' claim that Petro
acquired leasehold rights in forty surface acres surrounding the King "F" No. 2 wellbore. 
Just as the assignment language does not restrict Petro's operations to a specific vertical
producing interval, it also does not expressly or impliedly convey leasehold rights in any
horizontal surface acreage. Cf. David E. Pierce, An Analytical Approach to Drafting
Assignments, 44 Sw. L.J. 943, 955 (1990) (explaining that, presumably, the assignee is
entitled to the production allocated to the [lease] well even though he owns none of the
required leasehold acreage). 

 On the issue of the horizontal extent of the estate conveyed, Intervenors cite the
language in the assignments stating that the assigned interests are "subject to . . .
governmental regulations." Relying on this "governmental regulations clause," Intervenors
contend that, pursuant to Railroad Commission Rule 38, when Petro acquired rights in the
King "F" No. 2 wellbore, they also acquired rights in the minimum amount of surface
acreage needed to obtain a plug back permit for recompletion in the Brown Dolomite
formation. See 16 Tex. Admin. Code §§ 3.5., 3.38. (2007) (Tex. R.R. Comm'n, Application
To Drill, Deepen, Reenter, or Plug Back; Well Densities). We disagree. 

 As Intervenors acknowledge, the Railroad Commission is a regulatory agency and
lacks the authority to determine ownership of land or property rights. See, e.g., Amarillo
Oil Co. v. Energy-Agri Products, Inc., 794 S.W.2d 20, 26 (Tex. 1990). The government
regulations clause does not provide for additional leasehold rights contingent upon the
assignee seeking to commence certain wellbore operations. Simply put, there is nothing
in the assignments that suggests that, because the assigned interest is subject to
governmental regulation, the nature and scope of the interest assigned may vary. For this
reason, we find Intervenors position to be inconsistent with the plain language of the
assignments.

 Because the assignments are limited to "rights in the wellbore" we must determine
what the parties intended by that term. The assignments do not describe the King "F" No.
2 wellbore or even define the term "wellbore," therefore, we must turn to its generally
accepted meaning. A wellbore, sometimes called a borehole, is the hole in the ground
created by the process of drilling or boring a well. 8 Patrick H. Martin & Bruce M. Kramer,
Williams & Meyers Oil and Gas Law, Manual of Terms, 107, 1207 (9th ed. 1998). A well,
meanwhile, is defined as the "orifice in the ground made by drilling, boring or any other
manner, from which any petroleum or gas is obtained or obtainable . . . ." Id. at 1205. 
When read in context with the assignment language, these definitions indicate that Petro's
leasehold rights extend horizontally only to the area of the hole identified as the King "F"
No. 2 well and, by implication, such surface area adjacent thereto as is reasonably
necessary to operate the well.

Rights Appurtenant


 Consistent with the horizontal and vertical limitations of Petro's interest, the
assignments also conveyed all rights appurtenant to the underlying oil and gas leases. 
One of those rights was the right to develop the leased premises for the purpose of
"exploring, drilling, mining, operating for and producing oil, gas and other minerals." To
that extent, Petro's interest was not limited to production of gas from the Cleveland
formation. Therefore, subject to governmental regulations, the assignments in question
granted Petro the right to rework the King "F" No. 2 well so as to produce from any
formation that might possibly be reached from the existing wellbore. This right to develop,
however, does not extend beyond the present confines of the wellbore. In other words,
Petro does not have the right to extend the present well beyond its current depth, nor does
it have the right to drill horizontally beyond the confines of the existing wellbore.

 Another one of the rights assigned was the right to produce. Subject to the duties
imposed by the lease (e.g., the duty to pay the original lessor a royalty for oil or gas taken,
the duty to pay for damages occasioned by its operations, and the duty to restore the
surface upon abandonment of the well), Petro has the exclusive right to produce oil and
gas from the King "F" No. 2 well. Conversely, because the assignments in question did not
transfer Upland's determinable fee interest in the oil and gas in place outside of the
wellbore, Petro does not own an interest in the oil and gas in place outside the confines
of the King "F" No. 2 well. For these reasons, completion of the Skeeterbee wells did not
constitute a trespass onto property which Petro owned. For these same reasons, the
production of gas from the Skeeterbee wells did not constitute conversion of property
belonging to Petro. Because Petro does not have an ownership interest in the gas
produced from the Skeeterbee wells, Petro is not entitled to a portion of the proceeds or
to an accounting.

 To the extent that the leases embodied other rights not exclusive to the possession
and use of the wellbore in question (e.g., the right to extend the lease by the payment of
shut-in royalties), the assignment created a co-tenancy with the other lessees, with each
party sharing those incorporeal appurtenant rights.

 The practical effect of this construction is that Petro owns the exclusive right to
produce any oil, gas, or other minerals that may be produced from the King "F" No. 2
wellbore, consistent with the terms and conditions of the original leases. Subject to
governmental regulations, Petro also owns the right to develop the wellbore and conduct
any operations within the wellbore that would facilitate or enhance that development and
production, including the right to produce from other formations. Upland retained the
exclusive right, subject to the terms and conditions of the original leases and any
applicable governmental regulations, to produce any oil, gas, or other minerals that may
be extracted from the leased premises, other than through the King "F" No. 2 wellbore. 
Although this construction describes a relatively restrictive leasehold interest, it is
consistent with the fact that, from an area standpoint, a wellbore assignment is the
narrowest form of oil and gas assignment. Lawrence P. Terrell, Limited Assignments-Who
Gets What?, 35 Rocky Mtn. Min. L. Inst. 17, § 17.02 (1989).

 Our learned colleague's dissenting opinion states, "Rather than concluding the
parties intended to grant Petro the right to recomplete the well to produce gas it does not
own, we would construe the assignments' language in a manner consistent with our state's
ownership-in-place theory." (emphasis added) While the concept of producing oil and gas
that one does not own may seem unfair, it is hardly inconsistent with the ownership-in-place theory of mineral ownership. To the contrary, it is entirely consistent with over a
hundred years of precedent pertaining to the corollary doctrine of the "rule of capture." (4) 
The rule of capture is a rule of non-liability that determines what remedies, if any, that an
adjacent landowner has against his neighbor for production of migratory subsurface
minerals belonging to the owner-in-place. Essentially, the rule provides that, absent malice
or willful waste, landowners have the right to produce any migratory subsurface minerals
that they can "capture" without being liable to their neighbor, even if in doing so they
deprive their neighbor of their ownership interest in the actual minerals. See Sipriano v.
Great Spring Waters of America, Inc., 1 S.W.3d 75 (Tex. 1999) (discussing the correlative
rights of adjacent landowners to produce groundwater). Even though the legal effect of this
Court's interpretation is to allow Petro the right to produce gas that it does not own until it
captures it, and merely because that result may seem to be inconsistent with what
reasonable people would consider fair, that interpretation does give effect to the intent
expressed within the "four corners" of the instrument. It has long been recognized that,
absent exigent circumstances, even though the intent of the parties may seem illogical, the
law will not protect you from an improvident bargain. (5)

 Conclusion


 In summary, we find that the trial court erred in rendering its declaration of the rights
of the parties. To that extent, Intervenor's sole issue and Petro's issues one though three
are subsumed within the disposition of Petro's fourth issue, which is sustained in part (as
to the granting of summary judgment in favor of Upland's construction of the assignments)
and overruled in part (as to the denying of Petro's Motion for Partial Summary Judgment
and Intervenor's First Amended Motion for Partial Summary Judgment in favor of their
respective construction of the assignments). Because we also find that Petro did not have
title to the oil and gas in place outside of the King "F" No. 2 wellbore, we conclude that they
would not be entitled to an accounting of future production from the Skeeterbee wells. (6) 
Because Petro would not be entitled to have funds from current production tendered into
the court's registry, Petro's fifth issue regarding the same is also overruled.

 We reverse the judgment of the trial court and render judgment declaring that the
wellbore assignments in question transfer to the assignee an estate that extends to the
physical limits of the wellbore, together with all of the appurtenant rights incident to the
underlying lease. Accordingly, the plain language of the assignments conveys to Petro the
oil, gas and other minerals in place within the confines of the King "F" No. 2 wellbore,
together with those rights appurtenant to the original leases as may be necessary to the
production of those minerals and to the full use and enjoyment of that wellbore, including,
but not limited to the right to produce from any formation traversed by the wellbore. As a
result, Petro did not acquire title to the gas in place outside of the King "F" No. 2 wellbore
or the right to extend the existing wellbore into other areas of the lease. We further hold
that Upland retains their respective interest in the remainder of the leasehold estate, and
the rights appurtenant thereto. Petro's claims of trespass, bad faith trespass, conversion,
and money had and received are dismissed and their request that monies from current
production from the Skeeterbee wells be placed into the registry of the court is denied. 


 Patrick A. Pirtle

 Justice

 


Campbell, J., concurring and dissenting.
1. Although, ultimately, we seek to declare the ownership interests and rights of the
parties, we are constrained to declare only those interests and rights that were at issue
before the trial court. The rights and duties set forth herein should not be construed as an
exhaustive list of all of the rights and duties arising from the contract between the parties. 
Any attempt to set forth all of the rights and duties arising from the oil and gas leases at
issue would be both foolish and advisory. Judicial authority does not embrace the giving
of advisory opinions. Firemen's Ins. Co. of Newark, N.J. v. Burch, 442 S.W.2d 331, 333
(Tex. 1968).
2. The judgment merely recites that the assignments in question are "unambiguous"
and "grant[s] Defendant's motion for summary judgment and den[ies] Plaintiff's motion for
summary judgment and Intervenors' motion for summary judgment . . . ."
3. The canon of conveyance of the greatest estate provides that the instrument should
be construed to confer to the grantee the largest estate that the terms of the instrument will
permit. See generally Bruce M. Kramer, The Sisyphean Task of Interpreting Mineral
Deeds and Leases: An Encyclopedia of Canons of Construction, 24 Tex. Tech L. Rev. 1,
117-24. Section 5.001(a) states that "[a]n estate in land . . . is a fee simple unless the
estate is limited by express words or unless a lesser estate is conveyed or devised by
construction or operation of law." Tex. Prop. Code Ann. § 5.001(a) (Vernon 2004). See
also Ladd v. DuBose, 344 S.W.2d 476, 480 (Tex.App.-Amarillo 1961, no writ), citing
Waters v. Ellis, 158 Tex. 342, 312 S.W.2d 231, 234 (1958).
4. The Texas Supreme Court adopted the common-law rule of capture in 1904 in the
case of Houston & Texas Central Railway Co. v. East, 98 Tex. 146, 81 S.W. 279 (1904).
5. High Plains Nat. Gas Co. v. Railroad Com'n of Tex., 467 S.W.2d 532
(Tex.Civ.App.-Austin, 1971, writ ref'd n.r.e.); Carter v. Carter, 5 Tex. 93, 1849 WL 4064
(Tex. 1849).
6. We express no opinion as to whether or not Petro may be entitled to an accounting
of past production based upon any claim of damages which might have resulted from any
tortious interference with their right of production for the reason that no such claims have
been made.