

In The
Court of Appeals
Seventh District of Texas at Amarillo

_____

No. 07-20-00353-CV
_____

CHARLES HARRIS MCMORDIE, IN HIS CAPACITY AS TRUSTEE OF THE HOBART B. MCMORDIE, II ASSET MANAGEMENT TRUST, APPELLANT

V.

JOSE FERNANDO LICEAGA SANCHEZ, JOSE JESUS QUESADA SANCHEZ, JORGE ALFONSO QUESADA SANCHEZ, LUIS ARMANDO QUESADA SANCHEZ, FRANCISCO JAVIER QUESADA SANCHEZ, ALEJANDRO QUESADA SANCHEZ, EVA GUADALUPE QUESADA SANCHEZ, BLANCA LUISA LICEAGA SANCHEZ, MARY NOEMI DOBBS SANCHEZ, REBECA MORALES LICEAGA, LUIS JAIME MORALES LICEAGA, PABLO MORALES LICEAGA AND ALFONSO SANCHEZ VALDEZ AND FIRSTBANK SOUTHWEST, AS INDEPENDENT EXECUTOR OF THE ESTATE OF MAGDALENA SANCHEZ MCMORDIE, DECEASED, AND AS TRUSTEE OF THE MAGDALENA SANCHEZ MCMORDIE ASSET MANAGEMENT TRUST, APPELLEES

_____

On Appeal from the 251st District Court, Randall County, Texas
Trial Court No. 73,551C, Honorable Ana Estevez, Presiding

_____

November 4, 2021

MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and DOSS, JJ.

The appeal turns on what the parties to a spousal agreement said regarding ownership of a certain account at A.G. Edwards. Magdalena Sanchez McMordie and her husband Hobart B. McMordie were the parties to the accord, and through it, they intended

to divide their assets, both community and separate. This is not the first controversy involving their assets we have addressed. It was preceded by *McMordie v. McMordie*, No. 07-14-00393-CV, 2015 Tex. App. LEXIS 7702 (Tex. App.—Amarillo July 24, 2015, pet. denied) (mem. op.), wherein a dispute arose about whether Magdalena was entitled to the undistributed income accumulated in the Hobart B. McMordie, II Asset Management Trust (McMordie II Trust) during the life of Hobart. Charles Harris McMordie, a trustee of the trust, said she was not. This Court held she was. Charles, as trustee of the McMordie II Trust, again, attempts to capture property once belonging to Magdalena (who since has died). This time, though, it is comprised of "all of the A.G. Edwards Account" exceeding its content present therein when Hobart and Magdalena signed the aforementioned spousal agreement on November 1, 2004. The trial court rebuffed Charles's effort, holding that 1) "[t]he entire Wells Fargo Advisors account no. xxxx-3103 in the name of Magdalena S. McMordie is the successor to A.G. Edwards account no. xxx-xx6423-001 referenced in the Spousal Property Agreement"; 2) "it is not limited to the balance existing on the date the Spousal Property Agreement was executed"; and 3) "[t]he entire Wells Fargo Advisors account shall be distributed to the Sanchez Parties in accordance with the Last Will and Testament of Magdalena Sanchez McMordie dated May 21, 2013 and the First Amendment to the Magdalena Sanchez McMordie Asset Management Trust dated December 9, 2011." We affirm that decision.

Charles urges four issues on appeal. As previously mentioned, disposition of each turns on the interpretation of the spousal agreement. Thus, the rules applicable to interpreting contracts and writings control the outcome.

Interpreting a contract is a question of law we consider de novo. *Rieder v. Woods*, 603 S.W.3d 86, 94 (Tex. 2020). Thus, we are not bound by the trial court's interpretation of it. *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex. App.—Amarillo 2000, no pet.). Nor are we obligated to accept a particular viewpoint offered by a particular party. Rather, we are bound by the words expressed in the instrument. That is, construing the document does not mean rewriting it or adding to its language, for that is prohibited. *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 239 (Tex. 2016). As this Court said years ago, "we may not rewrite the agreement to mean something it did not." *Cross Timbers Oil Co.*, 22 S.W.3d at 26. "This is so because parties to the contract are considered masters of their own choices." *Id.* "They are entitled to select what terms and provisions to include in a contract before executing it." *Id.* So, we "cannot change the contract merely because we or one of the parties comes to dislike its provision or thinks that something else is needed." *Id.*;*accord BlueStone Nat. Res. II, LLC v. Nettye Engler Energy, LP*, No. 02-19-00236-CV, 2020 Tex. App. LEXIS 5095, at *9 (Tex. App.—Fort Worth July 9, 2020, pet. granted) (mem. op.) (stating the same).

And, from the words they chose, we strive to discern what the parties intended when signing it. *See Cross Timbers Oil Co.*, 22 S.W.3d at 26; *accord Rieder*, 603 S.W.3d at 94 (stating that a court's primary objective is to ascertain the parties' true intentions as expressed in the language they chose). Those words are to be accorded their plain, ordinary, and generally accepted meaning, unless the instrument requires otherwise. *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 874 (Tex. 2018); *Cross Timbers Oil Co.*, 22 S.W.3d at 26. The words of which we speak are not only those favoring a particular party, but instead, the words contained in the entire agreement. *Fischer*, 479 S.W.3d at 239. Each must be given meaning. *Choice! Power, L.P. v. Feeley*, 501 S.W.3d

3

199, 206 (Tex. App.—Houston [1st Dist.] 2016, no pet.) In discerning that meaning, we also note that "surrounding facts and circumstances that inform the contract text and render it capable of only one meaning" are susceptible to consideration. *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014). As said in *Americo*, a "written contract must be construed to give effect to the parties' intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution." *Id.* Those facts and circumstances include, among other things, the setting in which the agreement was struck and "objectively determinable factors that give context to the parties' transaction." *Id.* That said, we turn to the dispute at hand.

Hobart and Magdalena executed the spousal agreement on November 1, 2004.[1] It was not the only document they signed on that day. The others were 1) the McMordie II Trust, 2) Hobart McMordie's last will and testament, 3) Magdalena's asset management trust, and 4) her last will and testament. They having executed them contemporaneously reasonably evinces the four instruments to be a joint exercise at estate planning as of November 1, 2004. Consequently, they serve as facts and circumstances against which the text of the spousal agreement can be considered and understood.

Next, the spousal agreement they executed had five paragraphs. In the first, Magdalena transferred to Hobart, as his separate property, 1) a half interest in all her separate property located in the United States and 2) her one-half of their community estate located in the U.S. Excluded, though, were "the funds and securities in [her] account no. 423-001 ('Account') located at A.G. Edwards in Austin, Texas, which shall remain 100% [her] separate property." She also reiterated elsewhere in the paragraph

---

[1] The trial court found the spousal agreement "an enforceable contract." No one attacks that ruling here.

1) "100% of the Account shall remain the sole and separate property of MAGDALENA" and 2) "the funds and securities in [her] account no. 423-001 ('Account') located at A.G. Edwards in Austin, Texas, which shall remain 100% [her] separate property."

Hobart reciprocated in paragraph two. Through it, he gave his wife, as her separate property, 1) an "undivided one-half (1/2) interest in and to all of [his] separate property . . . located in the United States" and 2) his undivided half interest in the community estate located in the U.S. Excluded, though, was "the real property (surface, minerals and water rights) located in Roberts County, Texas"; that was to "remain 100% [his] separate property." He then referred to the A.G. Edwards account thrice. The first encompassed his statement that "[t]his gift, assignment, transfer and delivery specifically includes, but is not limited to, all of my community one-half (l/2) interest in account no. 115-346423-001 ('Account') of MAGDALENA . . . located at A.G. Edwards in Austin, Texas 100% of which is her sole and separate property." Following that was his statement: "100% of the Account shall remain my wife's sole and separate property." He then concluded the paragraph with: "I understand that I am giving all my interest in said account to MAGDALENA . . . in order that she shall own 100% of the Account as her sole and separate property." We note that each allusion to "account" or "Account" in this paragraph was not preceded by the phrase "funds and securities"; this included the first mention of it after which he placed the word "Account" in parentheticals so as to label that in which he relinquished his community interest. This differed from Magdalena's references to the account.

Having completed their respective assignments to each other in the first two paragraphs, the couple then used the third to address the intended disposition of property at their death. They began the paragraph by saying "notwithstanding anything to the

5

contrary" and "at the signing of this document." These were followed with the statement that they "***intend eventually*** that all of the A.G. Edwards Account" be distributed to the children of Magdalena's brothers and sisters in Mexico and the "rest and residue of her properties, owned individually or in trust, located in the United States, shall be distributed to the Hobart B. McMordie, II Asset Management Trust" for use by Magdalena during her lifetime with the remainder going to Charles and other of Hobart's nephews. The couple further expressed that they "intend" that Hobart's "interest in properties located in Mexico" be distributed to Magdalena or the children of her brothers and sisters while his properties located in the United States "be distributed to the 'Hobart B. McMordie, II Asset Management Trust'" for use by Magdalena during her life and the remainder being distributed to his nephews, Charles, Frank, and John McMordie. That this paragraph was meant to express their present expectation concerning the future disposition of the separate property encompassed within the agreement is clear, given use of the phrases "notwithstanding anything to the contrary," "at the signing of this document," and "intend eventually."

But, that the spousal agreement did not itself effectuate those future dispositions is also clear. That occurred through the four other instruments executed on November 1, 2004. Again, one consisted of Magdalena's trust to which she transferred "all of my interest in my property located within the United States which includes, but is not limited to, the property described on Schedule 'A.'"[2] Its stated purpose was to provide for the

---

[2] Described in "Schedule 'A'" were the "A.G. Edwards Account No. 123-001 in Austin, Texas," "Furniture & Furnishings," "Personal Effects," and "Automobiles." Reference to "all my interest in my property" would necessarily include both the assets in the A.G. Edwards account and the choses-in-action or contract rights implicit in the account created with A.G. Edwards. The latter too would be a property interest of hers. *See In re Marriage of Malacara,* 223 S.W.3d 600, 602 (Tex. App.—Amarillo 2007, no pet.) (per curiam) (stating that choses-in-action or contract rights are intangible property rights, such as a right to retirement benefits).

orderly distribution of the trust estate upon her death. She and Hobart were its beneficiaries. Upon their death, though, that part of the corpus comprised of "the A.G. Edwards Account" was to be "distributed to the children . . . of [her] brothers and sisters" while with the "the rest and residue" was to be "distributed to" the McMordie II Trust. In turn, Hobart conveyed to the McMordie II Trust "all of [his] interest in all of [his] estate and property owned by [him] individually or in trust." Its purpose also was to provide for the orderly distribution of the trust estate upon his death. And, through it, he gave Magdalena a life estate in the trust with the remainder in his nephews Charles, Frank, and John. Both then executed their respective wills which bequeathed the "rest and residue" of their estates to their respective trusts. Executing those four documents would have been redundant or meaningless if the third paragraph of the spousal agreement effectuated the "eventually intend[ed]" bequeaths or transfers described therein.

No one disputes that Magdalena's nieces and nephews were to receive the A.G. Edwards account at her death. Rather, the controversy involves the scope of that eventual bequest. That is, Charles would have us conclude that Magdalena intended to leave her nieces and nephews only the "funds and securities in" the account as of November 1, 2004, coupled with interest and dividends accruing on them. Charles derives his argument from the phase "the funds and securities in my account no. 423-001 ('Account') located at A.G. Edwards." No doubt, those were the actual words used by Magdalena and Hobart in paragraph one when describing the "Account" which "shall remain 100% [her] separate property." Yet, missing from them was express mention of a time frame. Nothing was said about limiting the "funds and securities" in the "Account" only to those in it on November 1, 2004. Nevertheless, Charles cites various authority as illustrating that the contractual provision should be so restricted.

7

The first is *McClary v. Thompson*, 65 S.W.3d 829 (Tex. App.—Fort Worth 2002, pet. denied). It concerned whether husband's pre-existing retirement program "remained" his separate property after marriage in its entirety. Husband believed it did because of a premarital agreement he and his wife signed. The agreement provided that "all benefits, dividends and earned and unearned proceeds in a retirement program" were his separate property. *Id.* at 837. Yet, if "cashed in or redeemed during marriage," it then became community assets. On the other hand, "if such benefits remain intact and the marriage is dissolved, such retirement benefits remain the separate property of [husband]." *Id.* The appellate panel held that provision only encompassed the benefits husband had prior to marriage. *Id.* at 838. Those accruing thereafter were community. *Id.* This was so because, in its view, the agreement 1) "is written in the present tense," 2) begins by stating that husband "**has** as his separate property," and 3) concludes with the passage "that those benefits '**shall remain** [his] separate property.'" *Id.* (emphasis in original). Furthermore, nothing in the agreement alluded to future contributions to the program as being separate property, according to the court. *Id. McClary* may have arguable application if reference to the A.G. Edwards account ended at paragraph one.[3] It did not.

As mentioned earlier, paragraph two dealt with it as well. There, Hobart agreed that his "community one-half (1/2) interest in account no. 115-346423-001 ('Account') of MAGDALENA . . . at A.G. Edwards in Austin" was "100%" "her sole and separate property." His expressed description of the "'Account'" to which he referred was not preceded by the phrase "funds and securities in." Instead, he said "interest in account number . . . ." Assigning his actual, unmodified words their plain meaning leads us to

---

[3] The other authority cited to us, *Fischer-Stoker v. Stoker*, 174 S.W.3d 272 (Tex. App.—Houston [1st Dist.] 2005, pet. denied), is distinguishable. It did not involve a spousal agreement containing verbiage unique to that at bar.

conclude that he intended the entire A.G. Edwards account to be his wife's separate property, that is, the account and its contents.[4]  This interpretation is reinforced by his ensuing statements that 1) "*100% of the Account* shall remain my wife's sole and separate property" and 2) "I am giving all my interest *in said account* to MAGDALENA . . . in order that she shall own *100% of the Account* as her sole and separate property." (Emphasis added).  The italicized words used his description of "'Account'" as included in his parenthetical which did not include "funds or securities in."  Same is also true in the ensuing paragraph of the agreement.

Paragraph three dealt with the "eventual" disposition of the properties divided in the spousal agreement.  Regarding the A.G. Edwards account, both Hobart and Magdalena specified that "*all of the A.G. Edwards Account* located in the United States, shall be distributed to the children . . . of [Magdalena's] brothers and sisters."  (Emphasis added).  As in paragraph two, the snippet "funds and securities in" was omitted from the description of what was to go to those particular heirs.  Instead, they wrote "all of the . . . Account."  "All" denotes the whole of it, that being the account and its content.  The "funds and securities in" it are not the entirety of the account.  Such a view omits the intangible property rights in the chose-in-action implicit in the contractual relationship between Magdalena and A.G. Edwards represented by the account itself.  Simply put, and irrespective of what Magdalena said in paragraph one, the couple agreed that both the

---

[4] That an account and its contents are two different property interests is shown by a simple example.  One opening a bank account creates contract rights or choses-in-action *viz-a-viz* the bank and person opening the account (much like a debtor creditor relationship).  *See In re Marriage of Malacara*, 223 S.W.3d at 602.  If opened before marriage, those contract rights inherent in the account are his separate property.  TEX. FAM. CODE ANN. § 3.001(1) (stating that a spouse's separate property includes property owned or claimed by the spouse before marriage).  In short, the account is his separate property.  If after the marriage the couple deposits their income earned during marriage, that income is community property. *In re Marriage of Born*, No. 06-08-00066-CV, 2009 Tex. App. LEXIS 2569, at *8 (Tex. App.—Texarkana Apr. 16, 2009, no pet.) (mem. op.).  Thus, while the income in it is community property, the account and contract rights inherent therein is separate property.  The two are distinct property interests.

account and its contents would pass to her nieces and nephews. That is the intent imparted by the plain meaning of the words they opted to use, and because they selected them to impart that intent, we must follow it.

The next issue we address involves the trial court's determination that "[t]he entire Wells Fargo Advisors account no. xxxx-3103 in the name of Magdalena S. McMordie is the successor to A.G. Edwards account no. xxx-xx6423-001 referenced in the Spousal Property Agreement." Charles argues that it was not. No one disputes that A.G. Edwards assigned a new account number (XXXX-3103) to the account described in the spousal agreement. A.G. Edwards subsequently became a division of Wachovia Securities L.L.C., which entity retained XXXX-3103 as the number representing Magdalena's account. Wells Fargo then acquired Wachovia and merged Wachovia into Wells Fargo. The Wachovia entity managing Magdalena's account changed its name to Wells Fargo Advisors while her Wachovia account became Wells Fargo Account No. XXXX-3103. Through all these corporate machinations, the asset owned by Magdalena remained the same, that is, the account and its contents, despite receiving different names and numbers. As said in *Eckels v. Davis*, 111 S.W.3d 687 (Tex. App.—Fort Worth 2003, pet. denied), "[w]e are required to subordinate form to substance." *Id.* at 697. Thus, the fact that designated assets are assigned a new account number does not defeat the general intent to dispose of those assets when they have not changed. *Id.* This is so because the assets are the substance while the account numbers assigned them are the form. Again, the assets in question here are the underlying account and its contents. They remained the assets despite the account being assigned new numbers during its lifetime.

The final issue we address is Charles's contention that allowing Magdalena to deposit other of her separate property into her A.G. Edwards account somehow breaches

10

the spousal agreement. We disagree. No such restrictions appear in the accord. The account was her separate property, as was the other property Hobart assigned to her via paragraph two. And, while she might have agreed to place all her separate property received as a result of the conveyance in paragraph two (save for "all of the A.G. Edwards Account") into the McMordie II Trust "for the use and benefit of MAGDALENA . . . for her lifetime," nothing was said about what she was supposed to do with the distributions once received during that lifetime. The agreement imposed upon her no obligation to return her distributions to the trust. Nor did it bar her from depositing them into her A.G. Edwards account. They were hers to do as she chooses. Similarly, absent was any provision obligating her to place property she acquired from other sources into an account other than the A.G. Edwards account.

As previously said, we are bound by the words the parties to an agreement choose to adopt. We cannot ignore or add to them. Nor can we rewrite the agreement because someone later finds disfavor with it. Hobart and Magdalena did not say anything about limiting what could be deposited into the A.G. Edwards Account. They said nothing about restricting her ability to handle what was hers in the way she wanted during her lifetime. They said nothing about prohibiting her from placing property she acquired after November 4, 2004, into the account. Nor did they include words of limitation in paragraph three when specifying what was to be left to the children of her brothers and sisters, such as "only the funds or securities in the A.G. Edwards Account as of November 1, 2004." They said "all" of the account goes to those heirs. All is all. Consequently, we overrule Charles's issues and affirm the trial court's summary judgment.

Brian Quinn
Chief Justice

11